## The State *ex rel.* the Attorney General v. Porter.

1. An act of the 31st of January, 1840, established a tenth judicial circuit; and a subsequent act of the 5th of February, 1840, provided that the judge of that circuit should not be required to alternate with the judges of the other circuits; but might do so when he thought it necessary—Held, that the supreme court may entertain an information in the nature of a *quo warranto*, under the second section of the constitution, to try the eligibility of an individual elected a judge of that circuit—otherwise, the respondent being the sole judge of the circuit, if he confined his judicial acts to the tenth circuit, the question could not be adjudicated.

2. The judiciary are invested with authority to try and determine the constitutional qualifications of an individual elected by the two houses of the General Assembly to a judgeship of the circuit court. Such an inquiry is not a political, but a judicial question. The case of The State *ex rel.* &c. v. Paul, (5 Stew. & Por. Rep. —) is consequently overruled.

3. The judicial circuits of this State were not created by the constitution, but owe their existence to the Legislature : Such also is the source to which the office of circuit judge is indebted for its creation.

4. Though circuit courts may have been long organized in the counties which compose a newly established circuit, yet the office of judge of the new circuit, must be considered as having been created by the same Legislature that established the circuit.

THIS is an information in the nature of a *quo warranto*, at the suit of the State, on the relation of the Attorney General, for the purpose of trying the respondent's right to the office of judge of the tenth circuit of this State.

The information sets forth in due form, that the respondent was duly elected, on the first Monday in August, eighteen hundred and thirty-nine, a representative of the county of Tuscaloosa, in the Legislature of this State: That in virtue of such election, he was duly qualified, and took his seat in the House of Representatives, of the Legislature which commenced its session on the first Monday of December thereafter: That afterwards, and during the period of the membership of the respondent, the Legislature, by their enactment, did create " the tenth judicial

The State *ex rel.* The Attorney General v. Porter.

circuit" of this State, and did organize the courts thereof, thereby creating the office of judge of that circuit; the election to which, was to be made by the two Houses of the General Assembly, then in session. And afterwards, and while the respondent was a member of the House of Representatives, the two Houses elected him to the judgeship of the circuit they had created. The information charges, that the respondent has taken the oaths, prescribed by law to be taken by a judge, and has exercised, and still continues to exercise, the liberties, privileges, &c. pertaining to that office; and concludes with a prayer that process may issue, requiring the respondent to answer, &c. by what warrant he claims to exercise, &c. the liberties, &c. aforesaid.

The respondent came into court, and waiving the issuance and service of process, made himself a party. And thereupon, the Attorney General and respondent agreeing to dispense with further pleading, or the production of evidence, submitted to the court, the following statement, as the basis for its judgment.

"Benjamin F. Porter 'was, on the first Monday in August, A. D. 1839, elected by the people of the county of Tuscaloosa, a representative to the State Legislature, and was qualified and took his seat accordingly; and discharged the duties thereof as alledged in the information. On the 31st day of January, 1840, a bill was passed by the Legislature, (but for which the said Porter did not vote,) establishing a tenth judicial circuit, by separating the counties of Mobile, Baldwin and Conecuh, from the then first judicial circuit, and forming an independent circuit of those three counties. On the 3d day of February, 1840, the Legislature, by joint vote, elected the said Benjamin F. Porter judge of said circuit. On the day of said election, before he, the said Porter, accepted the said office, he resigned his seat in the Legislature. On the 4th day of February, 1840, the said Porter accepted his commission, which bears date of that day; and on the 13th day of February, 1840, took the oath of office, and entered upon the discharge of his duties.

"The question arises, was the said appointment unconstitutional; and if so, can this court declare the same invalid.

87

" It is agreed that this statement of facts, shall be submitted to the court.                    (Signed)

B. F. PORTER.

M. W. LINDSAY,

Attorney General of the State of Alabama.

The Attorney General for the State, argued the case at the bar.

J. A. CAMPBELL on the same side, submitted a written argument, of which the following is an abstract:

He contended that the decision of this court, in the case of the State v. Paul, 5th Stewart & Porter, 40, was not a proper exposition of the constitution. That the apprehension which the court in determining that case, seemed to feel that the other departments of the government might refuse to reappoint, and then produce a conflict between two departments of the government, if not entirely groundless, should not have influenced the judgment of the court, whose duty it was to decide the law, without speculating on the consequences. He insisted that the presumption must be entertained, that each department of the government would perform its duty; and that if the supreme judicial tribunal pronounced the office vacant, the proper department would fill the vacancy. In support of these views, he cited the concluding remarks of Chief Justice Marshall, in the case of Craig *et al.* v. The State of Missouri, (4th Peter's Rep. p. 438.)

That it was not true that each of the departments of the government were required to determine finally, the extent of the powers confided to them. That on the contrary, when their acts came to operate upon an individual, or upon the community at large, there were none but might form the subject of examination.

Thus if the supreme court were to take original jurisdiction in an action of debt, or assumpsit, its judgment would be void, and afford no protection to the officer. If the executive should commission an officer, not returned to him as elected, the commission would be a nullity. A judicial decision, by the General Assembly, would have no force.

He denied, that the oath of office was the only security the people had taken against the exercise of unconstitutional power by either of the departments of the government. The constitution being the paramount law of the land, any act of either of the departments in violation of it is absolutely void, and must be so declared by the courts, whether it affects a single individual only, or as in this case, the whole community.

He compared the power conceded by the court to the co-ordinate departments, to the privilege claimed by the British House of Commons, to be the exclusive judge of the extent of its privileges; but the courts of that country declared that this was true, only when they did not violate the law of the land.

He insisted that the dilemma supposed by this court in the case of Paul, that the judges of this court should be unconstitutionally appointed by the Legislature, did not make against his argument, because the court would not be incompetent to try the question from a defect of *power*, but would be incompetent from *interest* in the particular question. The embarrassment would be accidental, affecting a single case, and did not impair the right to judge the entire class of cases.

He denied the correctness of the position assumed in Paul's case, that the matter to be controlled was the exercise of a sovereign political power, and one involving no conflict of individual right. He maintained that the usurpation of an office, is the invasion of a public and common right; and that if the person appointed by the Legislature was not eligible by the constitution, it was an usurpation and was in conflict with the individual rights of each, and the rights common to all. The election of a judge by the Legislature, is not the exercise of a sovereign political power, but on the contrary, it is a power delegated to the General Assembly by the people, to be exercised under the restrictions they have imposed. The jurisdiction of the Legislature did not arise from the act done, but from the instrument authorizing the act; and the act must be justifiable by that instrument, or it cannot be upheld.

In support of the views here taken, he cited, 1 McCord's

Rep. 52; 10th Mass. Rep. 30; 4th Missouri Rep. 303; Am. Jur. Oct. 1839; giving a decision of the supreme court of Pennsylvania.

As to the jurisdiction of this court and the proper form of proceeding, he contended that the constitution conferred upon the court the power to issue writs of *quo warranto,* and that whether this writ could be issued in all cases, or merely to " superintend and control inferior jurisdictions," was unimportant.

This court has frequently issued the writ of *mandamus,* the object of which is to require a judge to act; the writ of *quo warranto,* is a correlative writ, and proposes an inquiry into the authority by which an individual exercises an office or franchise: and these writs operate on the individual, as well as on the court to which they are addressed.   There is no other tribunal that can exercise jurisdiction in this case under this writ, and there is no other writ under which a judgment of *ouster* can be rendered.

He maintained that Judge Porter was ineligible.   It had been said by some, that the office was not created by the Legislature, but by the constitution: a consideration of the fifth section of the fifth article of the constitution, in connexion with the twenty-fifth section of the third article, would remove all doubts on the point.   The former provides that the State shall be divided into convenient circuits—that for each a judge shall be appointed, who shall reside within it.   It follows that a circuit must be established, before a judge can be appointed—the judge appointed is the judge of the particular circuit—hence the legislative action is indispensable to the creation of the office, as well as the appointment of the judge.

COLLIER, C. J.—The argument at the bar, has presented these questions: *First.* Has this court jurisdiction of the case stated in the information and agreed by the parties.   *Second.* Was the respondent constitutionally eligible to the judgeship of the tenth circuit; and if not, can this court pronounce a judgment of ouster.

*First.* By the *second section* of the *fifth article* of the constitution it is declared, that " The supreme court, except in cases

otherwise directed by this constitution, shall have appellate jurisdiction only; which shall be co-extensive with the State, under such restrictions and regulations, not repugnant to this constitution, as may from time to time be prescribed by law: *Provided*, That the supreme court shall have power to issue writs of injunction, mandamus, *quo warranto*, habeas corpus, and such other remedial and original writs, as may be necessary to give it a general superintendence and control of inferior jurisdictions." It has been heretofore considered that the jurisdiction conferred by the *proviso* to this section, was in general revisory, but held that if a case should occur in which no subordinate court could act, it would be competent for this court to award either one of the writs designated, or the appropriate remedial or original writ, that might be "necessary to give it a general superintendance and control of inferior jurisdictions." *Ex parte* Simonton *et al.* (9 Porter's Rep. 383: The State v. Jones, judge of the county court of Covington: *Ex parte* John, a slave: *Ex parte* Mansony; and the State, *ex rel.*, &c. v. Williams, *supra*.)

The question arises, is there any court inferior to this, which possesses the authority to determine the respondent's right to the office he is exercising. The solution of this question, makes it necessary, briefly to review the several statutes establishing the tenth circuit, and organizing the courts thereof. By the act of the 31st January, 1840, it is enacted "That the counties of Mobile, Baldwin and Conecuh, shall hereafter form and compose a judicial circuit, to be called the tenth judicial circuit of the State of Alabama, and for which a circuit judge shall be elected, who shall reside in, and be located in said circuit." The fifth section of the act of the 5th February, 1840, "to organize the courts of the tenth judicial circuit, and for other purposes," enacts, that the judge of that circuit, shall not be required to alternate with the judges of the other circuits; but may do so when he thinks it necessary. The respondent then, may, if he thinks proper in the discharge of official duty, confine himself to the three counties composing the tenth circuit.

The ancient writ of *quo warranto*, though said to be a civil

writ, at the suit of the crown, was nevertheless *quasi criminal;* being intended to punish an individual who had usurped an office, or franchise, by imposing a fine, as well as by ousting him of its enjoyment. The modern practice which has substituted the information in the nature of a *quo warranto* is also *quasi criminal;* the more especially, if the proceeding is instituted at the relation of the Attorney General. The complaint is made in behalf of the State, and charges, that the respondent exercises an office, without any lawful warrant, and calls on him to show his authority. The punishment inflicted is a fine, which is most usually nominal, and ouster of office, or a divestiture of the franchise claimed.

Such being the character of the information in nature of a *quo warranto*, it would seem necessarily to follow, that it must be filed in the circuit court of some county, in which the respondent exercised the office of judge, or if this be impracticable, then in this court, under the provision of the constitution already cited. The proceeding being *quasi criminal*, when the circuit court is resorted to, the usurpation charged, must be shown to have been committed in the county in which the proceeding is instituted.

The judge of the tenth circuit is not required to alternate with the judges of the other circuits, but it is left to his discretion to do so, when he deems it necessary. Now it may be, that he will only perform official duty in his own circuit, without holding a court, or doing a judicial act in any other. Under such circumstances, it would be impossible to test his right to the office by information in a circuit court; for none other than those of his own circuit could entertain jurisdiction, and acting as the sole judge, he could not sit in judgment upon the question. If then, this court under the constitutional grant of power, cannot take jurisdiction of the case at bar, the grave question proposed to be litigated, may not be tried before the respondent's commission shall expire, by the limitation prescribed to the judicial term.

But perhaps it may be said, that this court is only authorized

to issue " a writ of *quo warranto,*" when it is necessary to give it " a general superintendence and control of inferior jurisdictions;" and that by the term " jurisdiction" we are to understand a court, and not the judge of a court. This is, doubtless, true; yet, if by a procedure against a judge, the court in which he presides, is controlled in its action, the case comes within the letter of the constitution.

Now, in the case at bar, upon the supposition that the respondent is not *de jure* a judge, the courts of the tenth circuit may be holden by one who is constitutionally disqualified; unless the information against him can be here entertained. So that by a proceeding against the presiding judge, and his removal from office, " a control and superintendence" of the court itself, is exercised.

Again:—the writ of *quo warranto* does not lie against a court, but against some officer, or corporation, and the constitution in authorizing this court, to use it in aid of its superintending power, impliedly admits that inferior tribunals may be controlled, by questioning the right of their judges, to exercise the functions of their offices.

Though the constitution speaks of the writ of *quo warranto* in connection with others, yet we have no doubt that, instead of suing out the writ according to the ancient *formula,* it would be quite as regular, and more consonant to the modern practice to proceed by information. In designating one remedy it may be understood to have authorized another, of a kindred character, which is the more usual and appropriate remedy to effect the same end.

As the respondent so far as we are advised, has not exercised the office of judge elsewhere than in the tenth circuit, we think the jurisdiction of this court, for the reasons stated entirely defensible.

*Second*—But for the decision of this court, in the State *et al.* the Attorney General v. Paul, [5 Stewart and Porter Rep. 40.] we should not have thought it necessary to consider the right of the judiciary, to examine into the constitutional qualifications of

public officers, elected by " both houses of the General Assembly," and to pronounce a judgment of ouster when they are found ineligible. The opinion in that case being directly adverse to such a conclusion, and never having commanded the approbation of the profession, it is due to the country, that it should be re-examined and overruled, if it will not abide the test of scrutiny.

First then, the court say, that the election of a judge requires the exercise of a portion of the sovereign power of the State. That the constitution declares " the powers of the government of the State of Alabama, shall be divided into three distinct departments; and each of them confided to a separate body of magistracy, to wit: those which are legislative, to one; those which are executive, to another; and those which are judicial, to another." [1 sec. 2 art. constitution.] Further, " No person or persons, being one of those departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted." [2 sec. 2 art. constitution.] Again, it is provided that, " chancellors, judges of the supreme court, judges of the circuit court, and judges of the inferior courts, shall be elected by joint vote of both houses of the General Assembly." [12 sec. 5 art. constitution.] The court then proceeds, " thus it appears that the constitutional power of conferring judicial appointments, is vested in the two houses of the General Assembly, to be exercised by joint vote; that though it be in its nature, an authority not purely legislative, yet it is a power and trust, expressly confided to the legislative department of the government; and that each of the other distinct departments, is prohibited from exercising any superintendence or control over it, within its constitutional sphere of action.

" Admitting the true intent and proper construction of the constitution to be, that no other department, shall exercise or control the right of conferring such appointments; and that there is no express restriction of the authority, to adjudicate the eligibility of the incumbent—yet it is worthy of consideration if the

restriction be not implied—if the delegation of the power to one of the co-ordinate departments to confer the right, does not include the authority to decide conclusively, the constitutionality of the appointment, including the eligibility of the candidate they may elect."

The court then proceeds to draw a distinction, between a case in which a court is asked to declare a statute void, on account of its repugnance to the constitution, and where an election by the two houses of the General Assembly, is sought to be avoided; because the individual elected did not possess the constitutional qualifications. In the former the right is conceded to the judiciary, on the ground that the constitution is the supreme law—while in the latter it is denied; because, as it is said "that each of the co-ordinate departments of the government, is required by the constitution and genius of the government to determine its own powers—each is bound by the obligation of an oath, to support the constitution, and presumed competent to construe it correctly, in relation to its own action. The possibility that either may err in its construction, does not establish the necessity for an interference by another: infallibility is not attainable by either, and such intermeddling would tend to destroy the harmony which is essentially necessary."

The tendency of this argument is to prove, that each department of the government is supreme, as to the powers and duties confided to it.—That the two houses of the General Assembly, being charged with the duty of electing judges, are impliedly vested with the authority to examine, and definitively determine upon the qualification of those they may elect. Such a conclusion cannot be tolerated. That there may be acts of either one, or all the branches of the Legislature united, which cannot be drawn in question before the judiciary, will not be denied. Thus either house may elect its own officers, and the choice cannot be questioned; nor can the exercise of a mere *political* duty by the Legislature, or either of its branches be in any manner controlled. But that the election of a judge by joint vote of the two houses, is of a character so conclusive, as to forbid an ex-

88

amination into the right of the appointee to the office, cannot be admitted.

The members of the two houses must, in the first instance, determine for themselves, the qualifications of every person, who may be voted for by them for any office.  This, is nothing more than the duty imposed upon every individual of choosing his own line of conduct, when placed in a situation which requires him to act.  The fact, that an oath for the faithful performance of duty, is required to be taken before the representative is allowed to act, can have no influence in determining the extent of his powers, or the conclusiveness of his decision.  With an oath there is associated something of solemnity, yet if the constitution made no such requisition, there would still be a moral obligation, quite as high, to consult the welfare and wishes of the people, even if considered as less binding upon the conscience of the agent.  The oath then, can only be regarded as a means of obtaining an additional guaranty to the people, that those to whom they entrust their interests, will be influenced by integrity of purpose in the exercise of their judgments.

In the case of the State *ex rel.* &c. v. Paul, the court seem to have considered, that the constitution in conferring upon the two houses of the General Assembly, the right to elect the chancellors and judges, impliedly invest them with entire and exclusive authority, over the subject; and thus negative any interference with their choice.  This conclusion could only have been attained by a misapplication of the maxim *expressio unius exclusio est alterius.*  It is true, that the grant of power to the two houses to elect, is equivalent to an express denial of it to any other branch of the government, except, so far as the authority to appoint, in the event of a vacancy, is conferred upon the governor.  But after an election has been made, according to the forms of the constitution, there is no inhibition, either express or implied, upon the judiciary, which will prevent that department from inquiring, whether in the choice made, some feature of that instrument has not been violated, or an office conferred upon one, who was not eligible to its enjoyment.  The opposite

conclusion, if carried out to its legitimate result, would place the legislative above the judicial department, instead of making both co-workers, in their appropriate spheres, in the machinery of government.

To the Legislature pertains the right, to declare, make and modify the law, in as ample a manner, as the authority to elect public officers, does to the Senate and House of Representatives; and if the constitutionality of an election, is not examinable by the courts, how can they undertake to scan a statute, and determine it to be invalid, because of its incompatibility with the constitution?  The judges are pledged by an oath, to "support the constitution of the United States, and the constitution of the State of Alabama;" and their duties oblige them to administer the law according "to the best of their abilities."  The constitution is regarded as fundamental, and paramount law; and the Legislature is its creature, whose powers are to be ascertained, by a reference to the declared will of the creator.  This being the relation which the constitution bears to the Legislature, a judge could not discharge his pledge to the public, without treating as a nullity, a legislative act, which oppugns a constitutional provision.  And such too, has been the view taken of the duty of the judiciary, by all courts, so far as our researches extend. [See the authorities on this point, cited in my opinion in Dale v. The Governor, 3 Stewart's Rep. 418: and in The Matter of Dorsey, 7 Porter's Rep. 387.]

True, *Judge Gibson* delivered an opinion in Eakin *et al.* v. Rawb *et al.* (13 Serg't. & Rawle's Rep. 344,) remarkable for its ingenuity; in which he insists, that the judiciary is bound to execute the acts of the State Legislature, that are repugnant to its constitution, but not such as are opposed to the federal constitution.  He places his conclusions mainly upon the ground, that the constitution of Pennsylvania contain no express grant of political powers to the judiciary; and hence, it is a fallacy to suppose, that a legislative act and the constitution, can come in collision *before the judiciary.*  That as all respect is claimed for the decisions of the judiciary, upon the hypothesis that they cor-

rectly ascertain the law, so the judiciary should treat with a corresponding deference the acts of the Legislature, under the influence of the common law maxim, which make all intendment favorable to a public functionary. *Omnia presumi debeant vite et solemniter esse-acta.* The opposite conclusion, he insists might lead to controversies between the different departments of the government, which the framers of the constitution never intended should arise. "It then," says the learned judge, "rests with the people, in whom full and absolute sovereign power resides, to correct abuses in legislation, by instructing their representatives to repeal the obnoxious act." Without stating at greater length the grounds on which this opinion is founded, it is sufficient to say, that it is wholly unsustained by any judicial precedent, but is opposed by an unbroken current of decision, commencing immediately after the adoption of the federal constitution. In times of strong political excitement, controversies have arisen between the Legislature and the judiciary, but these controversies have been momentary, and as soon as reason has triumphed over the promptings of impulse and passion, the people have taken sides with the courts, and accorded to their decisions the force of authority. And so long as the right is conceded to the judiciary, of testing the validity of a legislative act by the provisions of the constitution, no serious collision need be apprehended; for it will have only to pronounce its judgment, to induce a conformity of action by the executive officers of the law. True, if the judiciary were to arrogate to itself the right to adjudge a political question, the decision of which properly pertains to either of the other departments, a collision might arise; but such an assumption cannot be anticipated, so long as the judicial is dependent upon the legislative branch of the government.

The justness of this view is not denied by the learned judges, who sat in judgment in the case of The State *ex rel.* &c. v. Paul, as it regards a legislative enactment. "With respect to statutes," the court say, "courts of justice cannot be neutral or passive: a conflict of rights arises between individuals, or corpo-

rate bodies competent to sue and be sued; one party claiming under the constitution, and the other under the statute: one or both must prevail, and they cannot be reconciled: it is the province of the judiciary to construe and administer the law; the consequence is, that the constitution being the *supreme law*, it must prevail in preference to the statute, and the latter become a dead or silent letter. This however, is not the result of any superiority in the judicial, over the legislative department. They remain co-ordinate; each acting independently within its respective sphere. The statute is not *repealed:* it remains in the code of laws; and should the same, or a higher tribunal, subsequently determine it to be consistent with the constitution, it is subject to be enforced accordingly."

Does not this reasoning apply with all force, to the eligibility of a man who has been elected to the bench by the two Houses, whether his right to the office has been questioned by an individual, or the State, through the Attorney General, in its political corporate capacity. In the one case, the relator denies the constitutional right of the respondent, and insists upon a better title in himself: while in the other, the people insist, that the constitution was the letter of attorney, by which their representatives were authorized to elect the chancellors and judges; that it prescribed the qualifications essential to these officers; that the respondent did not possess them; that the authority delegated, had been transcended; and that therefore, the election was invalid. Here is a case in which one party claims under the constitution, and the other, under a vote of the two Houses of the General Assembly. If, as the court say, the constitution is the "supreme law," must it not prevail? can it be possible, that greater respect and more potency should be accorded to an act, which has only received the sanction of the Senate and House of Representatives, than to a statute which has been enacted not only by them, but has been assented to by the Governor also? But the court say, that a decision adverse to the constitutionality of a statute, does not amount to its repeal, and the same or some higher tribunal, may determine in favor of its validity, and thus

leave it to be enforced.    But the difference in the consequence resulting from a decision, against the constitutionality of a statute, and the election of an individual to office, cannot determine the duty of the court.    They are both either constitutional, or otherwise, without stopping to inquire whether an opportunity will be afforded for an ulterior decision on the question.

In respect to its authority to oust a judge, because of his ineligibility, the court say, "a judicial decision, vacating the present appointment, would constitute a virtual requisition on a different department, to proceed to a re-appointment.    This might be refused; a collision between the departments be created, a consequence of which, would be, to obstruct or deny the administration of common justice."  If the judiciary have the right, as we think has been shown, to divest the respondent of his office, the intendment should be, that the other departments will do what duty requires, towards the appointment of a successor.    An apprehension that a refusal or neglect to appoint, or elect a successor, may produce a collision with a co-ordinate branch of government, furnishes no sufficient excuse for the judiciary to withhold its judgment.    The closing remarks of Chief Justice Marshall, in Craig *et al.* v. The State of Missouri, (4 Pet.   Rep. 437, '8) are strikingly appropriate.    "In the argument," says the Chief Justice "we have been reminded by one side, of the dignity of a sovereign State; of the humiliation, of her submitting herself to this tribunal; of the dangers which may result from inflicting a wound on that dignity; by the other, of the still superior dignity of the people of the United States, who have spoken their will in terms, which we cannot misunderstand.

"To these admonitions, we can only answer, that if the exercise of that jurisdiction, which has been *imposed* upon us by the constitution and laws of the United States, shall be calculated to bring on those dangers which have been indicated: or if it shall be indispensable to the preservation of the Union, and consequently of the independence and liberty of these States: these are considerations which address themselves to those departments, which may with perfect propriety be influenced by

them.   This department can listen only to the mandates of law; and can tread only. that path which is marked out by duty."

In the case of the State *ex rel.* &c. v. Paul, the court say further, "The constitution of the State expressly authorizes this court, to issue all such 'remedial and original writs as may be necessary to give it a general superintendance and control of *inferior jurisdictions*,' not co-ordinate departments.   The exertion of the power here applied for, would be the exercise of a superintending and controlling authority over not only the incumbent in office, but the appointing power."   In determining against the right of a judge to his office, on the ground that he was constitutionally ineligible, there is no direct control exercised over the appointing power.   The two Houses of the General Assembly are left free to make their own selection: the court merely says by its judgment, the individual chosen does not possess the qualifications provided by the charter under which he was elected.   In this there is nothing of dictation; it is merely sustaining the constitution as the *supreme law.*

The learned judge, who delivered the opinion in the case of the State *ex rel.* &c. v. Paul, supposes it might so happen, that a majority or all the judges of this court, would be elected under the same circumstances as the respondent, and then inquires if there could be an investigation as to his eligibility?   "I conceive not," says he: "besides the difficulty in selecting the revising tribunal, the matter to be controlled, would have been the exercise of a sovereign political power, by one of the highest departments of the government, and one involving no conflicting individual rights, presenting a judicial question."   With all deference, it may be said, that the state of things supposed is a bare possibility, and will probably never exist,   But grant that it had already occurred, and what influence can it exert in the solution of a grave constitutional question.   If the respondent was eligible, it must be because the constitution had authorized his election; not because the tribunal of *dernier* resort, was incompetent from interest, to adjudicate the question.   The competency or incompetency of the court, furnishes no test by

which the constitution is to be expounded, and the intention of its framers ascertained. That instrument itself must be our guide. Its meaning is fixed; the same, yesterday, to-day and to-morrow; unchanged and unchanging, by extraneous circumstances.

It would be wholly profitless to consider whether the election of a judge is " the exercise of a sovereign political power:" this may be conceded. The two Houses are certainly to judge of the intellectual and moral qualifications of the individual voted for; and must, in the first instance, determine for themselves, whether there is any constitutional disability applying to him; and if they err in their opinion as to the first, their decision cannot be revised: they are only accountable to their consciences, and to their country, politically. Such is the extent of the reasoning of the court in Marbury v. Madison (1 Cranch's Rep. 165.) But in defining the qualifications of a judge, the constitution addresses itself, as well to the judiciary, as to the electing and appointing powers; and if the latter mistake its behests, it is not only competent, but the duty of the former, upon a proper application, to repair the violation, and maintain its supremacy, by ousting the incumbent from office.　　　.

The distinction between questions which are political, and ultimately referable to the people as a high sovereign tribunal, and such as are judicial, and consequently examinable by the courts, is clearly stated by the late learned Chief Justice of the United States, in Marbury v. Madison, (cited above) and in McCulloch v. The State of Maryland, (4 Wheat. Rep. 400 et post.) Neither of these cases sustain the conclusion of the court in the case we are reviewing. A hasty examination of the language employed in Marbury v. Madison, doubtless induced the court to conclude, that as there was no individual contesting the right of Paul, to the judgeship of the eighth circuit, the State was only politically interested in his elegibility, and therefore no judicial inquiry could be made. In that case, it appeared that Marbury and others, had been appointed justices of the peace for the District of Columbia, by Mr. Adams, while President of the United

The State *ex rel.* the Attorney General v. Porter.

States—that commissions were regularly made out and signed and sealed. While they remained in the office of the Secretary of State, Mr. Jefferson succeeded to the Presidency, and his Secretary, Mr. Madison, refused to deliver them. The court after stating that the President is " invested with important political powers, in the exercise of which he is to use his own discretion," goes on to say that " he is authorized to appoint certain officers, who act by his authority, and in conformity with his orders."

" In such cases their acts are his acts; and whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion. The subjects are political. They respect the nation, not individual rights, and being intrusted to the executive, the decision of the executive is conclusive. The application of this remark, will be perceived by adverting to the act of Congress for establishing the department of foreign affairs. This officer, as his duties were prescribed by that act, is to conform precisely to the will of the President. He is the mere organ, by whom that will is communicated. The acts of such an officer, as an officer, can never be examinable by the courts.

" But when the Legislature proceeds to impose on that officer other duties; when he is directed peremptorily to perform other acts; when the rights of individuals are dependent on the performance of those acts; he is so far the officer of the law; is amenable to the laws for his conduct; and cannot, at his discretion, sport away the vested rights of others."

In that case, the court had already attained the conclusion that *Marbury and others,* the appointees of *Mr. Adams,* had a vested right to their offices; hence the propriety of speaking of *individual and vested rights.* But there is nothing in the opinion which favors the idea that the *political or judicial character* of a question, is to be tested by the fact, whether a solitary individual complains of an injury to his rights; or whether the people alledge that the rights guarantied to them by the con-

S9

stitution, have been violated.    And we have already shown that
no such test does or should exist.

To show that informations in the nature of a *quo waranto*,
have been entertained against judges at the relation of the Attor-
ney General and judgments of *ouster* pronounced, we need but
refer to the cases of the State v. McBride, (4 Missouri Rep.
303,) and the Commonwealth of Pennsylvania v. Collins, (22
vol. of the Am. Jurist, 183.)

We are then brought to the conclusion that the opinion de-
livered in the State *ex rel.* &c. v. Paul, cannot be sustained, and
that the powers of this court not only authorize, but require it,
in a proper case, to determine, whether an individual elected to
the bench by the two houses of the General Assembly, possesses
the constitutional qualifications for the office.

It remains but to inquire, whether the respondent was eligi-
ble to the judgeship of the tenth circuit, at the time of his elec-
tion.    By the twenty-fifth section of the third article of the
constitution, it is provided that " no Senator or Representative
shall, during the term for which he shall have been elected, be
appointed to any civil office of profit under this State, which
shall have been created, or the emoluments of which shall have
been increased, during such term ; except such offices as may be fill-
ed by elections by the people." It is admitted by the respondent,
that during the term for which he was elected a representative of
the county of Tuscaloosa, a law was enacted establishing a tenth
circuit, by separating the counties of Mobile, Baldwin and Cone-
cuh, from the first judicial circuit and forming them into an in-
dependent circuit; and that during the continuance of his term as
a representative, he was elected the judge of the circuit, thus es-
tablished.

It is perfectly clear, that the respondent was ineligible to the
office conferred upon him, if it can be considered as having been
created by the Legislature.    And as it is indebted for its creation
either to the constitution or the Legislature, it is necessary to de-
termine to which of these sources it owes its origin.

The fifth section, of the fifth article of the constitution, di-

rects, that " the State shall be divided into convenient circuits, and each circuit shall contain not less than three, nor more than six counties: and for each circuit there shall be appointed a judge, who shall after his appointment reside in the circuit for which he may be appointed." Thus it will be seen that the constitution instead of dividing the State into circuits, and creating the office of the circuit judges, devolved that duty upon the Legislature, to be exercised, as the increase of counties and population might render it expedient.

Until the act of the 31st of January, 1840, there was no circuit designated as the *tenth;* but that statute creates the circuit, and requires that a judge thereof shall be elected. Had the two Houses of the General Assembly, elected such an officer previous to that enactment, the election would have conferred no authority upon the appointee, nor have entitled him to the emoluments of office.

The first section of the fifth article of the constitution, vests a portion of the judicial power of the State in " circuit courts to be held in each county in the State," while the twelfth section of the same article declares, that " the judges of the circuit courts, &c., shall be elected by joint vote of both Houses of the General Assembly." What judges are to be elected? Most clearly such as shall be required by legislative acts, passed in obedience to the directions of the fifth section of the fifth article of the constitution.

The fact that the counties included in the tenth circuit, previously composed in part, the first circuit, does not make the statute of the 31st January, 1840, less an act of creation. Though each had its circuit court, yet it was under a different organization, so that the tenth circuit, or the office of judge (if the expression be allowable) had no vitality until the Legislature spoke them into being.

We are entirely satisfied that the respondent was ineligible to the judgeship of the tenth circuit, by the twenty-fifth section of the third article of the constitution, and should cause a judgment of ouster to be rendered, had we not been advised that he had

resigned the office of judge, since the commencement of this proceeding against him. The circumstances under which he has exercised the office of judge, are not such as to call for any other infliction than costs—and the information is dismissed with a judgment accordingly.