[No. 30642. Department One. February 18, 1949.]

THE STATE OF WASHINGTON, *Appellant,* v. AVERY DEXTER, *Respondent.*[1]

[1]Reported in 202 P. (2d) 906.

*The Attorney General* and *Lyle L. Iversen, Assistant,* for appellant.

*John T. Raftis,* for respondent.

*Charles H. Paul* (of *Hulbert, Helsell & Paul*), *amicus curiae.*

HILL, J.—Respondent Avery Dexter and Hazel Dexter, his wife, had since September, 1945, held title in fee simple to three hundred twenty acres of marketable second-growth timber in Pend Oreille county. Beginning in November, 1945, and continuing into 1946, Dexter cut approximately one hundred fifty thousand board feet, log measure,

of fir, larch, and white pine on that property; from November, 1945, until a restraining order issued in this action in October, 1947, he cut hemlock suitable for pulpwood.

In 1947, the state forester became aware that the respondent was cutting and removing timber, and directed him to shut down his operations until a permit was obtained. The respondent refused to apply for a permit, and proceedings were instituted by the state enjoining further timber-cutting operations until such time as the respondent should apply for and receive a permit from the state forester, which permit he could not obtain without giving satisfactory assurance that he would comply with chapter 193, p. 556, Laws of 1945, as amended by chapter 218, p. 928, Laws of 1947, being Rem. Supp. 1945, §§ 5823-10, 5823-16, 5823-18, and Rem. Supp. 1947, §§ 5823-11 to 5823-15, inclusive, and § 5823-17.

A demurrer was interposed, and, as it was apparent that the case was to be carried to this court, the trial court properly and wisely requested that the facts be stipulated and an answer be made to the complaint; and that was done. The trial court, being convinced that the statutes above referred to, under which the state forester had proceeded and the state had brought its action, are unconstitutional, then sustained the demurrer to the complaint, which had been amended to conform to the facts as stipulated, and dismissed the action. The state has appealed.

The act which was held to be unconstitutional by the trial court contains an expression of its purposes and policy in its first section, which reads as follows:

"Keeping the forest land of this state continuously and fully productive is one of the most important steps toward perpetuation and conservation of its forest resources. One of the most important means of effectuating such public policy is to keep timber lands productive by seeking to maintain continuous growth of timber on all lands suitable for such purposes, and in order to accomplish this end it is necessary, and in the public interest, to prescribe certain rules of forest practices to be observed in the harvesting of timber." Laws of 1945, chapter 193, § 1, p. 556.

It provides that every owner or operator shall leave reserve trees of commercial species in a quantity deemed adequate under normal conditions to maintain continuous forest growth, or provide adequate restocking to insure future forest protection. Different minimum standards of compliance are provided for operations east and west of the summit of the Cascade mountains. Every owner or operator conducting logging operations (with exceptions not here material) is required to secure a permit from the state forester, to secure which he has to agree to abide by the provisions of the act.

There is just one question before us, i. e., Is the statute constitutional? Or, stated more specifically, Does the state have the right, under its police power, to require those who engage in commercial logging operations to make provision for reforesting the area logged by leaving a certain number of trees for reseeding purposes or by restocking?

The police power of a state is declared

" . . . to include all those regulations designed to promote the public convenience, the general welfare, the general prosperity, and extends to all great public needs, as well as regulations designed to promote the public health, the public morals, or the public safety." *State v. Pitney,* 79 Wash. 608, 611, 140 Pac. 918, Ann. Cas. 1916A, 209.

And in *Campbell v. State,* 12 Wn. (2d) 459, 122 P. (2d) 458, we approved the following statement from *Shea v. Olson,* 185 Wash. 143, 153, 53 P. (2d) 615, 111 A. L. R. 998:

" 'However difficult it may be to give a precise or satisfactory definition of "police power," there is no doubt that the state, in the exercise of such power, may prescribe laws tending to promote the health, peace, morals, education, good order and welfare of the people. Police power is an attribute of sovereignty, an essential element of the power to govern, and a function that cannot be surrendered. It exists without express declaration, and the only limitation upon it is that it must reasonably tend to correct some evil or promote some interest of the state, and not violate any direct or positive mandate of the constitution. [Citing cases.]' "

■ The trial court in its "Memorandum Opinion" very ably champions the rights of private property and of private enterprise, and pictures graphically the effect of bureaucratic controls on farms and other lawful business in the state. We are in accord with much that is said therein, but it must be realized that private enterprise must utilize its private property in ways that are not inconsistent with the public welfare. The supreme court of the United States, speaking through its then chief justice, Charles Evans Hughes, in the case of *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U. S. 398, 442, 78 L. Ed. 413, 54 S. Ct. 231, 88 A. L. R. 1481, said:

"It is manifest from this review of our decisions that there has been a growing appreciation of public needs and of the necessity of finding ground for a rational compromise between individual rights and public welfare. The settlement and consequent contraction of the public domain, the pressure of a constantly increasing density of population, the interrelation of the activities of our people and the complexity of our economic interests, have inevitably led to an increased use of the organization of society in order to protect the very bases of individual opportunity. Where, in earlier days, it was thought that only the concerns of individuals or of classes were involved, and that those of the State itself were touched only remotely, it has later been found that the fundamental interests of the State are directly affected; and that the question is no longer merely that of one party to a contract as against another, but of the use of reasonable means to safeguard the economic structure upon which the good of all depends."

Unfortunately for the respondent's plea for the unrestricted right of the owner of timberland to do as he pleases with his own, the record of such unrestricted use has been one of "cut out and get out," the logged-off lands (having no economic value) being left to revert to the county for unpaid taxes. Denuded hillsides have made possible the rapid runoff of surface waters, thus increasing the dangers from floods and contributing to costly soil erosion.

Fifteen years ago we commented upon the problem of our vanishing forests and the problems of reforestation of the vast areas of our state from which the timber had al-

ready been removed, and the necessity of planting "denuded areas, to remedy, in part at least, the wasteful practices of the past." *State ex rel. Mason County Logging Co. v. Wiley*, 177 Wash. 65, 71, 31 P. (2d) 539. And now respondent, while personally disclaiming any wasteful practices, says in effect that individuals must be left free to continue such practices because they have a vested right so to do.

We do not think that the state is required by the constitution of the United States to stand idly by while its natural resources are depleted, and higher authority supports our view. *Walls v. Midland Carbon Co.*, 254 U. S. 300, 65 L. Ed. 276, 41 S. Ct. 118.

Today many companies, faced with the rapid diminution of stands of timber once deemed inexhaustible, have developed effective reforestation programs; the Federal and state governments have for many years carried out such programs at public expense. The issue, then, is: Can the state compel participation in a reforestation program on land for which no other beneficial use is contemplated? (The act does not apply where the removal of trees is sought, *inter alia*, for the following purposes:

" . . . (b) To clear the land upon which said trees are situated for bona fide agricultural, mining, business or residential purposes.

"(c) To clear rights of way, landings, campsites or firebreaks." Laws of 1945, chapter 193, § 9, p. 560.)

Edmund Burke once said that a great unwritten compact exists between the dead, the living, and the unborn. We leave to the unborn a colossal financial debt, perhaps inescapable, but incurred, none the less, in our time and for our immediate benefit. Such an unwritten compact requires that we leave to the unborn something more than debts and depleted natural resources. Surely, where natural resources can be utilized and at the same time perpetuated for future generations, what has been called "constitutional morality" requires that we do so. In that way, we can, in the words of Chief Justice Hughes, use "reasonable means to safeguard the economic structure

upon which the good of all depends." *Home Bldg. & Loan Ass'n v. Blaisdell, supra.*

There is ample and sound authority to sustain our conclusion that the challenged legislation is for the general or public welfare and is a proper exercise of the police power:

"The amount of land being incapable of increase, if the owners of large tracts can waste them at will without State restriction, the State and its people may be helplessly impoverished and one great purpose of government defeated." Opinion of the Justices, 103 Me. 506, 511, 69 Atl. 627, 19 L. R. A. (N. S.) 422.

"That the protection and conservation of the natural resources of the state are in the general welfare and serve a public purpose, and so constitute a reasonable exercise of the police power, is now so well settled that no further citation of authority is necesary." *Tulare Irr. Dist. v. Lindsay-Strathmore Irr. Dist.*, 3 Cal. (2d) 489, 529, 45 P. (2d) 972.

"One of the inherent powers of the State is to conserve her natural resources and to regulate the severance thereof." *State v. Standard Oil Co.*, 188 La. 978, 1007, 178 So. 601.

"The state, in the exercise of its power to enact laws for the general welfare of its people, may enact laws designed to increase the industries of the state, to develop its resources, and to add to its wealth. The majority of the authorities, moreover, support the rule that not only adjoining landowners, but the public at large, have an interest in the preservation of the natural resources of the country sufficient to justify appropriate legislation to prevent exploitation or waste of such resources by the owners of the land on which they are found. This rule finds specific expression in laws forbidding any waste of natural gas, oil, or mineral waters and subterranean flows and in laws forbidding the cutting of standing trees or the removal of stone, gravel, and sand from the seashore." 11 Am. Jur. 1034, Constitutional Law, § 276.

See, also, *State v. Van Vlack*, 101 Wash. 503, 172 Pac. 563, and *Wiegardt v. Brennan*, 192 Wash. 529, 73 P. (2d) 1330.

Respondent develops four arguments in support of the judgment, two of which may be considered together, *i. e.*: (1) The act authorizes what amounts to the taking of pri-

vate property without compensation and establishes an unreasonable exercise of the police power; and (2) it destroys private property rights and impairs the obligation of contracts as guaranteed by the constitution of the United States.

Respondent urges, and the trial court principally relied upon, the proposition that the act in question impairs the obligation of contracts, in contravention of Art. I, § 10, of the constitution of the United States. It is also strenuously urged that it provides for the taking of property without due process of law, in contravention of amendment 14 of the constitution of the United States, and Art. I, § 3, of the constitution of the state of Washington. These arguments are bottomed upon the proposition that there are no restrictive reservations in the patent from the United States preventing the cutting of timber on respondent's property or requiring reforestation, and that, having a fee-simple title, respondent is entitled to do as he pleases with his own property.

■ The answer to this argument is admirably expressed in the oft-quoted words of Chief Justice Shaw of the supreme judicial court of Massachusetts (quoted in part, with approval, via Story on the Constitution, vol. 2 (5th ed.), 701, § 1954, in *State v. Van Vlack, supra*):

"We think it is a settled principle, growing out of the nature of well ordered civil society, that every holder of property, however absolute and unqualified may be his title, holds it under the implied liability that his use of it may be so regulated, that it shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property, nor injurious to the rights of the community. All property in this commonwealth, as well that in the interior as that bordering on tide waters, is derived directly or indirectly from the government, and held subject to those general regulations, which are necessary to the common good and general welfare. Rights of property, like all other social and conventional rights, are subject to such reasonable limitations in their enjoyment, as shall prevent them from being injurious, and to such reasonable restraints and regulations established by law, as the legislature, under the governing and controlling power vested

in them by the constitution, may think necessary and expedient.

"This is very different from the right of eminent domain, the right of a government to take and appropriate private property to public use, whenever the public exigency requires it; which can be done only on condition of providing a reasonable compensation therefor. The power we allude to is rather the police power, the power vested in the legislature by the constitution, to make, ordain and establish all manner of wholesome and reasonable laws, statutes and ordinances, either with penalties or without, not repugnant to the constitution, as they shall judge to be for the good and welfare of the commonwealth, and of the subjects of the same." *Commonwealth v. Alger,* 61 Mass. (7 Cush.) 53, 84.

The contention with reference to the due process clause of the Federal and state constitutions is summarily disposed of by the supreme court of the United States in *Barbier v. Connolly,* 113 U. S. 27, 31, 28 L. Ed. 923, 5 S. Ct. 357, where, speaking of the fourteenth amendment, the court said:

"But neither the amendment—broad and comprehensive as it is—nor any other amendment, was designed to interfere with the power of the State, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education, and good order of the people, and to legislate so as to increase the industries of the State, develop its resources, and add to its wealth and prosperity";

and by this court in *Shea v. Olson,* 185 Wash. 143, 153, 53 P. (2d) 615, where we said:

"We next consider the provisions of Art. I, §§ 3 and 12 of the state constitution and the fourteenth amendment of the United States constitution, relating to due process and the equal protection of the laws.

"None of these constitutional provisions apply to laws enacted by a state legislature in the exercise of its police power. We have repeatedly so held. [Citing cases.]"

Cases will be found in the annotations in 24 A. L. R. 307 and 78 A. L. R. 834, upholding legislation designed to control the exploitation or waste of natural resources by the owners of land on which they are found, against various

constitutional objections, such as: (a) It constitutes a taking of property without due process of law; (b) it denies the equal protection of laws; (c) it grants special privileges or immunities or is class legislation; (d) it constitutes taking property without just compensation; (e) it impairs existing contract obligations; (f) it is local or special in its application. Most of the cases cited are oil and gas cases, which the trial court in the instant case seeks to distinguish on the basis that oil and gas wells drilled on one person's property may drain an extensive area and deprive adjacent owners of valuable property rights. However, the reasoning in most of the cases discussed in the annotations referred to does not predicate the right of regulation on the preservation of the rights of adjacent property owners, but on the interest of the public in the conservation of those resources.

Respondent also urges that the act in question is unreasonable, unnecessary, arbitrary, and oppressive, and is not required for the reasonable promotion of the general welfare.

It is possible that, while the ends sought to be achieved by certain legislative enactments are constitutional, the methods and procedures provided may be unreasonable, arbitrary, or oppressive, and not really designed to accomplish the expressed purpose of the act. *Washington ex rel. Seattle Title Trust Co. v. Roberge*, 278 U. S. 116, 73 L. Ed. 210, 49 S. Ct. 50, 86 A. L. R. 654.

Respondent's argument on this point is directed at § 5 of the 1945 act as amended (Rem. Supp. 1947, § 5823-14). The requirements of the statute are that reserve trees of commercial species adequate to maintain continuous forest growth must be left in the area logged, or that adequate restocking be provided. (Laws of 1947, chapter 218, § 3, amending § 4 of the 1945 act; Rem. Supp. 1947, § 5823-13.) East of the Cascades the act is complied with if all immature ponderosa pines of sixteen inches or less in diameter at breast height are left uncut, unless that would leave less than four ponderosa pines per acre of at least twelve inches in diameter at breast height. In that event, it is required

that there be left additional trees of commercial species predominant in the stand, including ponderosa pine, of sixteen inches or larger in diameter at breast height, in a quantity sufficient to aggregate four trees to the acre, well distributed over the area cut. (Laws of 1947, chapter 218, § 4, amending § 5 of the 1945 act; Rem. Supp. 1947, § 5823-14.)

Respondent takes the position that the effect of this provision is

" . . . to change the operation of this timber property from Avery Dexter to the State of Washington. Before Avery Dexter can now remove one stick of timber from his property, he must not only secure a written permit in advance, which may be denied, but he must also sign an agreement that he will go into the business of growing timber on his private property. Should he endeavor to restock his land with timber, and should he fail, for any reason whatever, the State can then step in and forfeit a sum of money worth practically the value of his land, and move upon his property, and engage in the business of growing timber in his stead."

As a matter of fact, all Avery Dexter or any other owner of land supporting a merchantable stand of timber located east of the Cascades is required to do, is to agree to leave uncut all ponderosa pines sixteen inches or less in diameter at shoulder height and, if there are not four ponderosa pines of twelve inches in diameter at shoulder height to the acre, to leave four trees to the acre meeting certain qualifications for reseeding the area cut. He does not have to agree to keep the land; he does not have to agree to grow timber; he does not have to guarantee reseeding. He just has to leave sufficient trees for that purpose. When the owner is not the operator, the forester may require an agreement that the owner will be jointly responsible with the operator for carrying out the provisions of the act, or that the operator furnish a bond or other security to insure satisfactory compliance with the act. That is a reasonable and proper provision; however, it does not affect Dexter, as he is an owner-operator. The restocking and money-forfeiture provisions referred to in the quotation from respondent's brief

become effective only if he elects *not to leave seed trees,* but, instead, to cut clear and restock.

Respondent also attacks the provision of § 5 as amended (Rem. Supp. 1947, § 5823-14) that, on areas of second-growth and prior cut timber, where poles, piling, mine timbers or other special products are being harvested, not over half of the trees between twelve and eighteen inches in diameter at breast height shall be cut within any ten-year period. The words of the supreme judicial court of Maine are apropos:

"While it might restrict the owner of wild and uncultivated lands in his use of them, might delay his taking some of the product, might defer his anticipated profits, and even thereby might cause him some loss of profit, it would nevertheless leave him his lands, their product and increase, untouched, and without diminution of title, estate or quantity. He would still have large measure of control and large opportunity to realize values. He might suffer delay but not deprivation. While the use might be restricted, it would not be appropriated or 'taken.'" Opinion of the Justices, 103 Me. 506, 512, 69 Atl. 627, 19 L. R. A. (N. S.) 422.

■ There is nothing within the terms of the act itself from which we can say that the requirements of § 5 as amended are unreasonable, arbitrary, or oppressive, or that they are not intended to accomplish the expressed purpose of the act. As we said in *Wiegardt v. Brennan, supra,* answering the argument of Wiegardt that the restriction against digging clams for commercial purposes on his own property during certain seasons of the year was unreasonable and arbitrary:

"It frequently happens that regulatory laws, enacted under the police power in furtherance of some appropriate purpose, impose hardship in individual cases, due to special and peculiar circumstances; but this fact will not subject the law to constitutional objection."

■ Respondent argues, finally, that the act grants special privileges, in violation of Art. I, § 12, of our state constitution, and tends to create a monopoly of the timber resources of the state. Respondent reasons:

"The final result will be that, because of the unreasonable and oppressive terms and conditions of this act, the ordinary private individual of limited means will be unable to retain his present holdings, or acquire further future holdings to remove timber. The natural result will be that the timber lands of this State will eventually fall into the hands of those who can afford to hold them over a long period of years. The result will be a monopoly of the timber business, and the public welfare will not thereby be advanced, but will be adversely affected."

The act is equally applicable to all owners and operators and does not require the holding of land over long periods of years. It merely requires, as a protection against the logger who intends to "cut out and get out," that he leave sufficient trees to reseed the cutover area, or submit some acceptable alternative to accomplish the purpose of maintaining continuous forest growth.

On the facts as stipulated, the appellant was entitled to prevail, and the trial court erred in dismissing the action. The cause is remanded, with instructions to enter an order enjoining the defendant from further timber-cutting operations within the purview of chapter 193 of the Laws of 1945, as amended by chapter 218 of the Laws of 1947, until he shall have obtained a permit from the state forester and given satisfactory assurances that he will, in his timber-cutting operations, comply with chapter 193 of the Laws of 1945, as amended.

BEALS, STEINERT, and MALLERY, JJ., concur.

SIMPSON, J. (dissenting)—Because the majority opinion approves a law which takes from the people of this state another of their constitutional rights, I dissent.

The development of the doctrine of "the police power" has passed all constitutional barriers, so that now all that is necessary to introduce and enforce any repressive measure is to use a high-sounding, plausible preamble, and the courts will then approve, regardless of the fact that personal liberties are taken from the individual. Let us not forget that

" . . . the Constitution itself is in every real sense a law—the lawmakers being the people themselves, in whom under our system all political power and sovereignty primarily resides, and through whom such power and sovereignty primarily speaks. It is by that law, and not otherwise, that the legislative, executive, and judicial agencies which it created exercise such political authority as they have been permitted to possess. The Constitution speaks for itself in terms so plain that to misunderstand their import is not rationally possible. 'We the people of the United States,' it says, 'do ordain and establish this Constitution . . .' Ordain and establish! These are definite words of enactment, and without more would stamp what follows with the dignity and character of law. The framers of the Constitution, however, were not content to let the matter rest here, but provided explicitly—'This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; . . . shall be the supreme Law of the Land; . . .' The supremacy of the Constitution as law is thus declared without qualification. That supremacy is absolute; the supremacy of a statute enacted by Congress is not absolute but conditioned upon its being made in pursuance of the Constitution. And a judicial tribunal, clothed by that instrument with complete judicial power, and, therefore, by the very nature of the power, required to ascertain and apply the law to the facts in every case or proceeding properly brought for adjudication, must apply the supreme law and reject the inferior statute whenever the two conflict." *Carter v. Carter Coal Co.*, 298 U. S. 238, 80 L. Ed. 1160, 56 S. Ct. 855.

As stated in the above case, "Every journey to a forbidden end begins with the first step." That danger is apparent in the statute before us. The only difficulty with us is that we have too many times taken the first step. It is not too late to reform.

True, it is of importance that we preserve our natural resources, but they should not be preserved at the expense of the liberties of the people of this state and nation, and that is the thing the present act proposes to do. I call attention to certain provisions of the law which either encroach upon, or take away, an individual's right to do with his property as he pleases. I shall point out later that an

individual has a right to sell his own property in any way he sees fit, and to use his property as he desires.

*Any* bona fide *owner or operator of land* in the state with a merchantable stand of timber to be cut during the current year, *must first obtain a written permit from the forester.* The owner or operator must make a written application to the forester, and submit a map showing the area to be logged, legal description, and acreage. Should application be made by the operator, the forester may require that he secure from the owner, and file with the forester, an agreement that the owner will be jointly responsible with the operator for the carrying out of the requirements of the act, or that the operator shall furnish a bond or other security satisfactory to the forester to assure satisfactory compliance with the act. The permits expire at the end of each calendar year, but may be renewed upon the written application of the owner, providing there has been no violation of the act. The foregoing provisions are found in Laws of 1947, chapter 218, § 2, p. 929.

Section 4 of the act provides that every permittee must provide that during the process of logging adequate precautions shall be taken to *leave reserve trees of commercial species deemed adequate* under normal conditions to maintain continuous forest growth, or *provide adequate restocking to insure future forest production.* The act then specifies when poles or stands of timber may be *cut and sold,* and what *portion of the timber must be left to grow.* Section 7, chapter 193 of the act of 1945 provides that the *owner or operator may adopt other practical methods than contained in the act, but if he does, they must* be *approved by the forester.* Section 6 of the 1947 law is so very definite that I quote it in full:

"SEC. 6. Section 8 of chapter 193, Laws of 1945 (Rem. 1945 Supp. 5823-17; PPC 1945, 574h-15) is hereby amended to read as follows:

"Section 8. The *Forester* shall have the power to employ a sufficient *number of technically trained foresters as inspectors* to enable him to maintain an *inspection service* deemed adequate to *secure compliance with the provisions of this act.* In the event that an *owner or operator shall fail,*

*refuse or neglect to comply with the provisions of this act,* the *Forester* shall be empowered to *order* the particular operation in which the violation occurs *discontinued* until the owner or operator has given satisfactory assurance that he will resume operations in compliance with the provisions of this act and *furnish cash deposit* or bond in lieu thereof as set by the Forester but not to exceed eight dollars ($8) per acre for that portion of the area which through his failure to carry out the provisions of this act does not have sufficient source of seed to adequately restock the area. *Such order may be enforced by injunction proceedings.* Such cash deposit or bond shall be furnished to insure that the owner or operator will artificially restock the area for which the money was collected, within five (5) years. *In the event that at the end of said five (5) years the owner or operator has not artificially restocked the area, or this area has not become adequately restocked, the cash deposit shall be forfeited,* or if the owner or operator has posted bond in lieu of making cash deposit he shall within thirty (30) days after notification in writing by the Forester furnish the amount of money for which he has posted bond. The Forester shall place this money in a special deposit fund of the State Treasury for artificially restocking the land on which the deposit was withheld. *The Forester shall artificially restock the area within two (2) years after said deposit has been forfeited,* using the money in the special deposit fund collected from the owner for that purpose. In the event that the full amount of money forfeited for any specified area is not required by the Forester to restock the area, the unexpended balance shall be returned to the depositor. *Until compliance is so assured, the Forester shall also have power to prevent any new operation or operations in this state by the delinquent operator.* Any person violating the provisions of this act by operating without a permit shall be guilty of a misdemeanor, and each day of operation shall constitute a separate offense." (Italics mine.)

Section 9 of the 1945 act contains a provision that the act in question shall not apply where, upon application to the state forester, he has in writing permitted the removal of trees. The permits are required to be issued when removal is sought, (1) to benefit the general health and increase annual growth of residual timber stands, or for the purpose of removing dying or diseased trees; (2) to clear the land upon which said trees are situated for bona fide agricultural,

mining, business, or residential purposes; (3) to clear rights of way, landings, campsites, or firebreaks. In other words, *the management and control of property owned by an individual is transferred to the forester.* The American citizen who owns land upon which there are trees has no longer any right to do other than obey the dictates of the state forester.

Appellant says in its brief:

"It will not do to say that only the land owner is concerned with whether timber growth is perpetuated on his land. That is the concern of the man who must in the future buy timber, of the laborer who hopes to make a living from the lumber industry, of the merchant, the banker and the manufacturer, who depend upon a stable economy in our state. In short it is the concern of everyone."

In other words, it is the right of the state and not that of the citizen, which counts. If this be so, why limit ourselves to timber. As counsel for respondent points out, why not include our fields, our grains, our livestock, our soil, our places of private enterprise, the rearing of our children, the ordering of our daily lives? For, are not these things, too, the concern of everyone? What is more important than the raising of families? If the argument of the state is sound, why not have marriage bureaus with a director at the head so that every couple who desires to marry would be compelled to apply to the director for a permit, whereupon he would conduct an investigation to ascertain whether or not they were properly mated before approving their application.

Why not, also, if the state is to be the predominant factor, compel people who wish to have children to first get a permit from the director of the bureau. In short, if we follow the argument to which I have just referred, and the holdings of this court in the present and some other cases, then we should have bureaus to see to it that we have a government of men and not of laws—in other words, a police state.

The trial judge, in his memorandum opinion, expressed the situation exceptionally well in the following language:

"The invasion of the respective states, as well as the Federal Government, in the right of every individual to conduct

his business in compliance with law has gone far beyond our conception of a few years ago of what could possibly happen. It should not be permitted to go further irrespective of the extent that a legislative body may believe it should go, voluntarily or under undue pressure. It is apparent that if the constitutionality of the law in question is upheld, that it is only one step further to the control, domination, and, in fact, operation of the farms and other lawful business of this state directed by bureaus, agencies, and incompetents. It could also be extended to the great fruit producing areas of the state whereby fruit growers would be required to plant apples, peaches, prunes, pears, apricots, or other fruit trees and vines as designated and demanded by a state agency regardless of the wishes and experience and judgment of the owner of the land. This should never be permitted, but if there is a continuation of the policy as indicated in the present law, there can be no end to final and complete control and domination of the forests and farms of every type, as well as other business activities of the people of the state under guise of the police power."

In this case, I contend that the act under consideration seeks to take private property without consideration.

"The right of private property is a natural, inherent, and inalienable right. Such right antedates all constitutions, but to insure its continuance, it is guaranteed by the federal and by the various state constitutions. As explained in § 599 et seq, infra, the right to property is also included within the constitutional guaranties of due process of law.

"As protected by the various constitutions, property is more than a mere thing which a person owns. The constitutional guaranty embraces the right to acquire, possess, use, enjoy, protect, improve, lease, and dispose of property." 16 C. J. S. 606, Constitutional Law, § 209.

By reference, I reiterate as a dissent here the statements made in my dissent in *State v. Sears*, 4 Wn. (2d) 200, 223, 103 P. (2d) 337.

The constitution of the state of Washington contains the following provisions declaratory of property rights in this state:

"PERSONAL RIGHTS.—No person shall be deprived of life, liberty, or property without due process of law." Washington constitution, Art. I, § 3.

"INVASION OF PRIVATE AFFAIRS OR HOME PROHIBITED.—No person shall be disturbed in his private affairs, or his home invaded without authority of law." Washington constitution, Art. I, § 7.

"EMINENT DOMAIN.—Private property shall not be taken for private use, except for private ways of necessity, and for drains, flumes, or ditches on or across the lands of others for agricultural, domestic, or sanitary purposes. No private property shall be taken or damaged for public or private use without just compensation having been first made, or paid into court for the owner . . . Whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public shall be a judicial question, and determined as such, without regard to any legislative assertion that the use is public." Washington constitution, Art. I, § 16 (now amendment 9).

The legislature sought by the passage of the act under consideration to take from the people of this state a property right (the right to sell property) without just, or any, compensation whatever. The legislature, by this same act, has sought to compel property owners to expend money and labor to reforest their lands. All this is prohibited by our state and Federal constitutions.

As I have indicated, the ultimate end is confiscation of property rights and the imposition of governmental decrees by political appointees.

The act (Laws of 1947, chapter 218, § 6) also provides for the employment of inspectors. I presume that in violation of Art. I, § 7, of our state constitution which reads: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law," the inspectors will go upon the lands of those owning property and disturb their private affairs to see that the owners obey the mandates of the state forester.

The supreme court of Montana announced the proper rule in *Gas Products Co. v. Rankin*, 63 Mont. 372, 207 Pac. 993, 24 A. L. R. 294. That decision concerned a statute which declared that the burning of natural gas without utilizing all the heat therein contained for other manufacturing or domestic purposes, was wasteful and unlawful

and prohibited that act. In holding the act unconstitutional, the court said:

"Were we to sustain the constitutionality of the Act, there would be no limit to which the legislature might go in depriving persons of the use of private property under the guise of the police power. If it may constitutionally prohibit the use of natural gas taken from privately owned property for use in one industrial or manufacturing business, why not in another? If the rule contended for is given sanction, the use of natural gas in blast furnaces, smelters, factories or for cooking, heating or lighting is equally a proper subject for such prohibitory legislation. Under this rule there is no limit to which the legislature may not go. The owner of coal or minerals in the ground may thus by legislative control have his property rights so limited and restricted that he would be compelled to abandon mining although the owner of the fee in the land. The same rule would be applicable to percolating waters, oil, growing trees and agricultural crops grown upon the land. The land owner would be subject to regulation as to the number, kind and character of trees he might cut on his own land, and the conditions for cutting imposed. In short, all recognized principles of property rights would thus be destroyed. If the legislature may prohibit the burning of natural gas in the manufacture of carbon black because of the loss of heat units, why may it not as reasonably condemn its use for fuel on account of the fact that the carbon black contained therein is wasted? We are living in a free government, with definite guaranties of property rights, not under the rule of an emperor or czar. Such legislation is paternalistic in character and conflicts with the guaranties of the national and state Constitution and is contrary to the theory upon which our government was formed. The paternal theory of government is odious, and we should not treat lightly or disregard the sacred rights of property recognized and guaranteed by the government."

---

March 28, 1949. Petition for rehearing denied.