[No. 39914. En Banc. November 21, 1968.]

OCEANOGRAPHIC COMMISSION OF WASHINGTON *et al.*, *Plaintiffs*, v. ROBERT S. O'BRIEN, *as State Treasurer, et al., Defendants.**

*Reported in 447 P.2d 707.

*The Attorney General* and *Charles E. Siljeg, Special Assistant,* for plaintiffs.

*The Attorney General, Philip H. Austin* and *Kenneth R. Ahlf, Assistants,* for defendants.

HAMILTON, J.—This is an original mandamus proceeding. Plaintiffs seek to compel defendants, the State Treasurer and the Budget Director, to honor certain vouchers, and to execute, issue and honor warrants thereon in payment of expenses incurred by six members of the Oceanographic Commission of Washington. The defendants' refusal to make these payments is based upon the fact that these six members of the commission were also members of the fortieth (1967) state legislature which created the commission

through enactment of Laws of 1967, ch. 243. Because of this fact, defendants contend the respective legislative-members of the commission are constitutionally ineligible to serve upon the commission during the remainder of their present terms of office. Defendants predicate this contention upon the language of article 2, section 13 of the state constitution, which provides:

No member of the legislature, during the term for which he is elected, shall be appointed or elected to any civil office in the state, which shall have been created, or the emoluments of which shall have been increased, during the term for which he was elected.

The question thus presented is whether membership on the Oceanographic Commission constitutes a holding of "civil office."

■ Generally speaking, the basic considerations, and a starting point, in determining the character of a public office, *e.g.*, whether it is a "civil office," are the purposes of its creation and the nature of its duties and functions. *State ex rel. Brown v. Blew*, 20 Wn.2d 47, 145 P.2d 554 (1944); *State ex rel. Johnston v. Melton*, 192 Wash. 379, 73 P.2d 1334 (1937); 67 C.J.S. *Officers* § 2(a) at 99.

With this in mind we turn to the pertinent legislation.

Laws of 1967, ch. 243, § 1, declares that this state's unsullied seacoast and Puget Sound area

presents a natural base for expanding efforts to uncover and utilize the potentially rich food, oil and mineral natural resources of the western Pacific Ocean continental shelf, to locate and harvest abundant fish and marine life, to develop fish farms and aquatic agriculture through the utilization of the estuaries and bays of Puget Sound, to conduct studies of marine and aquatic life, to research and develop seafood uses and seafood processing plants, to locate a temperate zone marine laboratory, to collect and distribute living marine organisms for marine and biological research, and to conduct research into weather forecasting and modification.

The legislation then points out that a permanent organization is essential to fully exploit the strategic position of

the state as a base for the listed activities, with appropriate regard for

> the ancillary needs of providing planned waterfront development, public recreation, conservation, and prevention of water pollution . . . .

Against the backdrop of these asserted objectives, section 2 proceeds to create the Oceanographic Commission. It provides, among other things, that the commission will be composed of 12 members, three of whom are to be appointed from the state Senate by the President of the Senate, and three of whom are to be appointed from the House of Representatives by the Speaker of the House. It further provides that members of the commission are to serve without compensation, although reimbursement for necessary travel and other expenses incurred in the performance of their duties is authorized.

Section 4 of the act enumerates the powers, duties and functions of the commission as follows:

> (1) Encourage, assist, develop and maintain a coordinated program in oceanography for the benefit of the citizens of the state and the nation;
>
> (2) Encourage private industrial enterprise to utilize the Puget Sound area as a base for oceanographic work;
>
> (3) Promote national interest in Puget Sound as a base for national oceanographic programs;
>
> (4) Assist in developing educational programs to provide the professional and technical graduates required by oceanographic expansion in the area;
>
> (5) Undertake projects designed to inform the citizenry of the importance of oceanography to the development of the area;
>
> (6) Assist in the study of problems of waterfront development, pollution, and parks and recreation areas for public use;
>
> (7) Accept funds, gifts, bequests, and devises from any lawful source given or made available for the purposes of this act, including but not limited to grants of funds made with or without a matching requirement by the federal government;

(8) Encourage, supplement and assist the development of programs under the National Sea Grant College and Program Act of 1966 by the University of Washington and other participating educational institutions of the state and region. The programs and mission of the commission and its institute are not to be in duplication of the existing program of the University of Washington or other educational institutions of the state in oceanographic research, training or public service, or of the program developed under the National Sea Grant College and Program Act of 1966.

(9) Make annual reports to the Washington State Legislature, or to the appropriate interim committee thereof, all activities undertaken in connection with the power, duties and functions assigned in this section together with any recommendations for new legislation designed to accomplish the purposes of this act.

(10) Delegate in its discretion and to the extent permitted by the state Constitution, any of the powers and duties set forth in subsections (1) through (8) to the Oceanographic Institute of Washington formed pursuant to section 5 of this act.

By section 5 of the act, the commission, in the furtherance of its duties and functions, is authorized to form a nonprofit corporation under the provisions of and with the powers provided by RCW 24.04,[1] with members of the commission being members and trustees of the corporation together with such additional trustees, not exceeding 20 in all, as a majority of the commission members shall accept.

---

[1]RCW 24.04.080 lists the powers of a nonprofit corporation formed pursuant to RCW 24.04, in part, as follows:

[may] sue and be sued in any court, may make and use a common seal and alter the same at pleasure, may receive gifts and devises, may purchase, hold and convey real and personal property, as the purposes of the corporation may require, may appoint such subordinate agents or officers as the business may require, may demand assessments of members and sell or forfeit their interests in the corporation for default with respect to any lawful provision of the bylaws, may enter into any lawful contracts and incur obligations essential to the transaction of its affairs for the purpose for which it was formed, may borrow money and issue notes, bills or evidence of indebtedness, and may mortgage its property to secure the same as its bylaws may provide, and, generally, may do all things necessary or proper to carry out the purpose of its creation.

This corporation, pursuant to this section of the law, shall be designated as the Oceanographic Institute of Washington and is empowered to coordinate, promote and carry out such policies for oceanographic programs and development as may be advised, consented to and formulated by the commission. Furthermore, the corporation is authorized to accept, use and expend such public funds as are lawfully made available to it, and to exercise such other powers and duties as the commission may legally delegate to it.

Following enactment of Laws of 1967, ch. 243, the legislature by Laws of 1967, Ex. Ses., ch. 143, § 1, appropriated the sum of $150,000 to finance the operations of the commission for the 1967-1969 biennium.

With these legislatively stated purposes, objectives and avenues of performance before us, we look now to a determination of the question of whether a position of membership on the Oceanographic Commission constitutes a "civil office," within the contemplation of article 2, section 13, of the state constitution. In resolving this question, we proceed upon the basis of the test laid down in *State ex rel. Barney v. Hawkins,* 79 Mont. 506, 257 Pac. 411, 53 A.L.R. 583 (1927), and adopted by this court in *State ex rel. McIntosh v. Hutchinson,* 187 Wash. 61, 59 P.2d 1117, 105 A.L.R. 1234 (1936), and in *State ex rel. Hamblen v. Yelle,* 29 Wn.2d 68, 185 P.2d 723 (1947). The test, in pertinent part, is stated as follows, at 76:

". . . five elements are indispensable in any position of public employment, in order to make it a public office of a civil nature: (1) It must be created by the Constitution or by the legislature or created by a municipality or other body through authority conferred by the legislature; (2) it must possess a delegation of a portion of the sovereign power of government, to be exercised for the benefit of the public; (3) the powers conferred and the duties to be discharged must be defined, directly or impliedly, by the legislature or through legislative authority; (4) the duties must be performed independently and without control of a superior power, other than the law, unless they be those of an inferior or subordinate office, created or authorized by the legislature and

by it placed under the general control of a superior officer or body; (5) it must have some permanency and continuity and not be only temporary or occasional."

If any of these five elements be absent from a position of public employment, such employment is not a public office of a civil nature. *State ex rel. Hamblen v. Yelle, supra.* In the instant case, the parties chiefly contest whether the membership of the Oceanographic Commission possesses any delegation of the sovereign power of government (element No. 2). We are in accord with the tacit acknowledgment of the parties that the other four elements are present.

Sovereign power is broadly defined as the power to govern, or as that power in a state to which none other is superior or equal, and which includes all the specific powers necessary to accomplish the legitimate ends and purposes of government. Black's Law Dictionary, 4th ed. (1957). More refined definitions speak of the sovereign power of a government as manifesting itself in but three ways, *i.e.,* by the power of taxation, by the power of eminent domain, and by way of the police power of the government. *United States v. Douglas-Willan Sartoris Co.,* 3 Wyo. 287, 22 Pac. 92 (1889). Other definitions relate the sovereign power of government to a person who is specifically invested by statute or law with independent functions and duties related to and designed to carry out the inherent police powers of the particular government involved, or who is vested with independent power in disposing of public property or incurring financial obligations on the part of the government, or who is appropriately empowered by the government to independently act in situations involving the various business or political dealings between individuals and the public, wherein the latter must act through the organ of government. *State ex rel. Landis v. Board of Comm'rs of Butler Cy.,* 95 Ohio St. 157, 115 N.E. 919 (1917); *State ex rel. Pickett v. Truman,* 333 Mo. 1018, 64 S.W.2d 105 (1933); *State ex rel. Webb v. Pigg,* 363 Mo. 133, 249 S.W.2d 435 (1952).

■ However broadly or particularly the term sovereign power may be defined, it is certain that, among other attributes, it embraces an exercise of the government's inherent police power, which, in turn, and by ordinary definition, extends to the preservation of the public health, safety, and morals, as well as to the regulation, preservation, promotion and development of natural resources. *Clark v. Dwyer,* 56 Wn.2d 425, 353 P.2d 941 (1960); *State v. Dexter,* 32 Wn.2d 551, 202 P.2d 906, 13 A.L.R.2d 1081 (1949).

Against this backdrop, plaintiffs strenuously argue that their statutory duties and functions are delimited, and do not extend to or permit them to exercise any portion of the state's sovereignty. In support of this contention, plaintiffs point to certain public offices or agencies which have been held to be devoid of sovereign power.

It is true, as plaintiffs assert, that certain public positions do not embody any portion of a state's sovereignty. In one such category are legislative advisory committees, the duties and functions of which are simply that of collecting data, exchanging information and formulating proposals to be placed before the legislature. Thus, in *State ex rel. Hamblen v. Yelle, supra,* we held that a legislative interim committee exercised no sovereign powers in studying and reporting on the efficiency of state government. Likewise, in *State ex rel. Herbert v. Ferguson,* 142 Ohio St. 496, 52 N.E.2d 980 (1944), a "post-war commission," established to gather data relative to post-war problems and to evaluate and make recommendations, was held to exercise no sovereign powers, provided, however, it did not undertake to purchase or lease any lands in the name of the state. *Cf. State ex rel. James v. Aronson,* 132 Mont. 120, 314 P.2d 849 (1957), and *Jewett v. Williams,* 84 Idaho 93, 369 P.2d 590 (1962).

Another category of public positions which embody no portion of a state's sovereignty is that of "employments." In *State ex rel. Brown v. Blew,* 20 Wn.2d 47, 145 P.2d 554 (1944), this court held that a court reporter for the superior court was an "employee" rather than a "public officer," in part because the functions of the position did not include

the exercise of sovereign power. In *People ex rel. Board of Trustees of Univ. of Illinois v. Barrett,* 382 Ill. 321, 46 N.E.2d 951 (1943), the University of Illinois was found to be an agent of the state for the purpose of operating an educational institution, but it functioned as an independent corporate entity, and therefore exercised no sovereign power. In *Opinion of the Justices,* 3 Me. 481 (1822), an agent for the superintendence and preservation of public timber land was designated as an employee, not significantly different in status from that of a contractor engaged to construct a state building, and as such was not invested with any sovereign authority. And, in *United States ex rel. Noyes v. Hatch,* 1 Pin. 182 (Wis. 1842), the functioning of a board of commissioners appointed by the Governor to operate a canal company on behalf of the public was characterized as an employment rather than as a public office because of the lack of sovereign power.

■ In our view neither of the foregoing categories of public positions which embrace no portion of the sovereignty is applicable to a position of membership on the Washington Oceanographic Commission. The duties and functions of the commission, unlike those of a legislative advisory committee, are not limited to assembling data and formulating proposals. Neither is it directly responsible to nor does it act under the immediate supervision of any superior authority, contractual or otherwise, as would be the case in a position of employment. On the contrary, the commission is statutorily mandated to "exploit" the strategic position of this state as a base for oceanographic activities. It is given the power to "encourage," "assist," "develop," and "maintain" oceanographic programs, to "promote" national interest in Puget Sound, to "undertake" educational projects, to "accept" funds and other grants, to interact with other agencies in the furtherance of public recreational or conservation programs and the control of water pollution, and to form and fund a nonprofit corporation to facilitate the exercise of its powers and the accomplishment of its objectives. Public funds are appropriated to and are to be expended by the commission in the fur-

therance of its aims. Independent initiative and the exercise of discretion in selecting a course or courses of action designed to carry out its purposes within the framework of the statute are lodged in the commission. In short, it is designed as an arm of the state to promote, develop, maintain, and preserve a most valuable natural resource for the benefit of the citizens of this state and the public at large. Under these circumstances, we are satisfied the commission is clothed with and exercises a portion of the state's police power in performing its functions.

Plaintiffs contend, however, that commission membership should be characterized as "positions of trust" rather than "civil offices," thus avoiding the impact of article 2, section 13, of the state constitution. They say this should be so upon the theory that the commission is designed to function primarily in a proprietary capacity, with its objectives being pursued by nongovernmental means, and without the benefit of such traditional sovereign attributes as the rule making or regulatory power, the quasi-judicial hearing power, or the powers of eminent domain or taxation.

Again, we are unable to agree with plaintiffs.

In determining whether the methods by which a public position, vested with any portion of sovereign power, is authorized to exercise that power, or whether the absence of a particular means by which it could exercise the power, is vital to that position's status as a "civil office," we look to the constitutional context in which the term "civil office" arises.

Const. art 2, § 13, with which we are concerned, provides:

> No member of the legislature, during the term for which he is elected, shall be appointed or elected to *any civil office in the state,* which shall have been created, or the emoluments of which shall have been increased, during the term for which he was elected. (Italics ours.)

In reference to this constitutional provision, we quoted from Story on the Constitution § 867 (1891) in *State ex rel. O'Connell v. Dubuque,* 68 Wn.2d 553, 413 P.2d 972 (1966), at 567, as follows:

The reasons for excluding persons from offices who have been concerned in creating them, or increasing their emoluments, are to take away, as far as possible, any improper bias in the vote of the representative, and to secure to the constituents some solemn pledge of his disinterestedness.

And, in *State ex rel. French v. Clausen,* 107 Wash. 667, 182 Pac. 610 (1919), we adopted the language of the Michigan Supreme Court in *Fyfe v. Kent Cy. Clerk,* 149 Mich. 349, 112 N.W. 725 (1907), wherein that court stated relative to a like constitutional provision, at 673:

"The purpose of these provisions is 'to preserve a pure public policy,' or, as we said in *Ellis v. Lennon,* 86 Mich. 468, speaking through Justice McGrath, 'to prevent officers from using their official position in the creation of offices for themselves or for the appointment of themselves to place.' "

■■ Without doubt, a strong public policy exists in favor of eligibility for public office, and the constitution, where the language and context allows, should be construed so as to preserve this eligibility. *State ex rel. O'Connell v. Dubuque, supra.* It does not follow, however, that, in the furtherance of this policy, we are permitted to give words or phrases an unnatural or uncommon construction or application, and thereby run in opposition to the public policy giving rise to the pertinent constitutional provision. We cannot, in good conscience, derive from the words of article 2, section 13, or from the purpose for its existence, any indication of intent or reason to distinguish between its application to offices, vested with a portion of sovereign power, solely upon the basis of the particular methods which are, or are not, statutorily provided to carry out the exercise of its sovereign power. This being our view, we are restrained from characterizing membership on the commission as "positions of trust," rather than "civil offices" within the contemplation of article 2, section 13.

■ The fact that there is no salary or pecuniary emolument affixed to membership on the commission does not make it any less a civil office. *Advisory Opinion to Gover-*

*nor*, 49 Fla. 269, 39 So. 63 (1905); 42 Am. Jur. *Public Officers* § 61. Neither does the absence of pecuniary attraction immunize the office from the constitutional limitation of article 2, section 13. As we have observed, this constitutional limitation was intended to avoid any improper bias, or the temptation thereof, on the part of legislators, which might arise from opportunities to create offices offering aggrandizement, personal, pecuniary or otherwise, to which they might be elected or appointed during the term for which they were elected.

■ Accordingly, we are constrained to hold that the members of the Oceanographic Commission have been appointed to civil offices of this state, and, as a result, those six plaintiffs who, in addition to being members of this commission, were members of the 1967 state legislature which created the commission, are presently rendered ineligible to hold these civil offices by the terms of article 2, section 13, of the state constitution.

Our disposition of this matter makes it unnecessary for us to consider the further issue presented by the parties relating to the board of trustees of the Oceanographic Institute, the nonprofit corporation contemplated by Laws of 1967, ch. 243. Likewise, we do not deem it appropriate for us to undertake the rendition of an advisory opinion dealing with the question of how vacancies on the commission, arising from the present ineligibility of the plaintiffs, may be filled.

Finally, we conclude with the observation that we have not considered nor have we passed upon any question bearing upon the validity of Laws of 1967, ch. 243. Our review has been specifically limited to the question of the eligibility of plaintiffs to serve as members of the commission during their current terms of legislative office.

The petition for writ of mandamus is denied.

HILL, WEAVER, ROSELLINI, HUNTER, HALE, and McGOVERN, JJ., and WARD, J. Pro Tem., concur.

FINLEY, C. J. (dissenting)—Two questions of law are determinative of the relators' right to relief. The first ques-

tion encompasses the rationale of *State ex rel. Hamblen v. Yelle*, 29 Wn.2d 68, 185 P.2d 723 (1947). It is: Does the Oceanographic Commission have power to act in any manner in which it could not act if organized as a legislative interim committee? The second question expresses a long-standing policy limitation followed in the interpretation of article 2, section 13 of the Constitution of the State of Washington. It is: Does the Commission exercise "sovereign power?"

These questions express our settled decisional law. Attempts to answer them cannot rely upon the manipulation of formulae. They must be squarely faced, and resolved with full attention to the balance of social interests involved. Unless these questions can be unequivocally answered in the affirmative, relators are entitled to the relief which they seek. To refuse relators that relief, unless it is clearly and unmistakably demonstrable that both of the questions require an affirmative answer, is an unwarranted substitution of our own discretion for that of the legislature.

I.

Relators have argued that the Commission is, in effect, a legislative advisory committee. In *State ex rel. Hamblen v. Yelle*, 29 Wn.2d 68, 185 P.2d 723 (1947), this court established the validity of appointments of legislators during their term of office to the Legislative Council. The powers of that council are quite broad, and are set out in the margin as approved in the *Hamblen* case.[2] It may be urged

---

[2]Laws of 1947, ch. 36, pp. 61-64:

"Sec. 2. The council shall have the following powers and duties: (1) To perform, either through the council as a whole or through subcommittees thereof, all duties and functions customarily delegated to special interim legislative committees;

"(2) To examine and study the administrative organization and procedures of the state government, its offices, boards, committees, commissions, institutions and other state agencies and to make recommendations, where found advisable, directed to the elimination of unnecessary overlapping or duplication of functions, procedures and expenditures, and to the promotion of economy and efficiency in state government;

that the *Hamblen* case concerned a council composed solely of legislators. But the *Hamblen* opinion relies strongly upon *Parker v. Riley*, 18 Cal. 2d 83, 113 P.2d 873, 134 A.L.R. 1405 (1941), a case concerning application of a similar provision of the California constitution to a "commission on interstate cooperation" consisting of members of both houses and citizens appointed by the Governor. The terms of the legislative members were to cease if they ceased to be members

"(3) To make current examination and reports concerning the current condition of all state funds, appropriations and other state moneys; concerning whether or not such appropriations are being currently expended for the purposes and within the statutory restrictions provided by the Legislature; and concerning the current availability of revenue to meet expenditures under appropriations;

"(4) To make such other studies and examinations of the state government and its state agencies as it may find advisable and to hear complaints, hold hearings, gather information and make findings of fact with respect thereto;

"(5) To receive messages and reports in person or in writing from the Governor or any other state officials and to attend generally to any and all business addressed to or affecting the Legislature during the interim between regular legislative sessions; and

"(6) To make reports from time to time to the members of the Legislature and to the public with respect to any of its findings or recommendations. The council shall keep complete minutes of its meetings. The council shall make and distribute its final report to the members of the ensuing Legislature at least ten days prior to the convening of the Legislature.

"(7) To cooperate, act and function with similar councils or committees of other states, with the Council of State Governments, and with other interstate research organizations.

"Sec. 3. In the discharge of any duty herein imposed, the council and its subcommittees shall have the authority to examine and inspect all files, records and accounts of any state office, department, institution, board, commission or agency, and to administer oaths, issue subpoenas, compel the attendance of witnesses and the production of any papers, books, accounts, documents and testimony, and to cause the deposition of witnesses, . . . .

". . . .

"Sec. 5. The council shall have authority to select and employ an executive secretary, together with such other clerical, legal, accounting, research, and other assistants as it may deem desirable, whose compensation and salaries shall be fixed by the council.

". . . .

"Sec. 7. The State Legislative Council shall have authority to make its own rules and regulations governing the conduct of its business not otherwise prescribed in this act. . . . ."

of corresponding committees of their respective houses. The California court held the membership in the commission imposed no trust or office upon the legislators not inherent in their capacity as legislators. The reasoning of that court is instructive:

The constitutional provision clearly implies that the prohibition is directed at the conferring of any other office, trust, or employment upon a member of the legislature. A member of the legislature is already an officer holding a position of trust under the state government. Where a statute *merely makes available new machinery and new methods by which particular legislators may keep themselves informed upon specific problems, it cannot be said to have imposed upon them any new office or trust.* The additional duties which rest upon the legislative members of the commission are identical in purpose and kind with those which they already perform. As was said in *People v. Tremaine,* 252 N.Y. 27, 41 [168 N.E. 817], "The duties of members of the Legislature may be enlarged without making a civil appointment or creating a new office, so long as the duties are such as may be properly attached to the legislative office. . . ." 18 Cal. 2d at 88, 113 P.2d at 876. (Italics mine.)

Has a new trust or office been imposed upon the legislative members of the Oceanographic Commission? The powers granted to the Oceanographic Commission are extensive.[3] The Commission is to develop and maintain pro-

---

[3] RCW 43.94.040:

"The commission shall have the following powers, duties and functions:

"(1) Encourage, assist, develop and maintain a coordinated program in oceanography for the benefit of the citizens of the state and the nation;

"(2) Encourage private industrial enterprise to utilize the Puget Sound area as a base for oceanographic work;

"(3) Promote national interest in Puget Sound as a base for national oceanographic programs;

"(4) Assist in developing educational programs to provide the professional and technical graduates required by oceanographic expansion in the area;

"(5) Undertake projects designed to inform the citizenry of the importance of oceanography to the development of the area;

"(6) Assist in the study of problems of waterfront development, pollution, and parks and recreation areas for public use;

grams, undertake informational projects, and encourage, supplement, and assist the development of programs under the National Sea Grant College and Program Act by the University of Washington and other participating educational institutions of the state and region. Although it is also to conduct studies and report to the legislature, examination of its functions leaves serious doubt that they could be exercised with propriety by a legislative interim committee.

However, resolution of the second of the two queries posed in the opening paragraph of this dissent is in my opinion dispositive of this case. Consequently, further development or discussion of the principles of the *Hamblen* case should be deferred until they are squarely presented to the court.

---

"(7) Accept funds, gifts, bequests, and devises from any lawful source given or made available for the purposes of this chapter, including but not limited to grants of funds made with or without a matching requirement by the federal government;

"(8) Encourage, supplement and assist the development of programs under the National Sea Grant College and Program Act of 1966 by the University of Washington and other participating educational institutions of the state and region. The programs and misssion of the commission and its institute are not to be in duplication of the existing program of the University of Washington or other educational institutions of the state in oceanographic research, training or public service, or of the program developed under the National Sea Grant College and Program Act of 1966.

"(9) Make annual reports to the Washington state legislature, or to the appropriate interim committee thereof, all activities undertaken in connection with the power, duties and functions assigned in this section together with any recommendations for new legislation designed to accomplish the purposes of this chapter.

"(10) Delegate in its discretion and to the extent permitted by the state Constitution, any of the powers and duties set forth in subsections (1) through (8) to the Oceanographic Institute of Washington formed pursuant to RCW 43.94.050."

As the enactment contains a severability clause, speculation on the validity of the delegation to the Oceanographic Institute (RCW 43.94.050 (1967)) is unnecessary. It appears, however, that the act contemplates a delegation of the unusual powers to the Institute, leaving the Commission charged solely with a reporting function more normally associated with legislative committees.

## II.

If the powers exercised by the Oceanographic Commission are not "sovereign power" within our cases, then relators' appointments to the Commission are proper and they are entitled to the relief sought in this proceeding.

I find little help in disposing of this problem in the cases cited by the majority. *State ex rel. Landis v. Board of Comm'rs of Butler Cy.*, 95 Ohio St. 157, 115 N.E. 919 (1917), held that the clerk to a board of county commissioners did not exercise sovereign powers. *State ex rel. Pickett v. Truman*, 333 Mo. 1018, 64 S.W.2d 105 (1933), held that a statutorily authorized attorney employed on contract to collect back taxes was not invested with sovereign power. *State ex rel. Webb v. Pigg*, 363 Mo. 133, 249 S.W.2d 435 (1952), reached the same conclusion as to the clerk of an intermediate state appellate court. The standard applied in the Missouri cases is lifted in whole from the Ohio opinion, and all of the cases concern offices which are part of the traditional apparatus of government. The present case concerns itself with an interesting innovation, designed by the legislature to take advantage of a somewhat unique situation. It ought not to be disposed of by a wooden standard, woodenly applied.

Of the three heads of sovereign power set forth in *State ex rel. Landis, supra,* and the alternative three set out in *United States v. Douglas-Willan Sartoris Co.*, 3 Wyo. 287, 22 Pac. 92 (1889), the majority opinion selects the police power as encompassing the activities of the Oceanographic Commission. In so doing, it relies upon *Clark v. Dwyer*, 56 Wn.2d 425, 353 P.2d 941 (1960), and *State v. Dexter*, 32 Wn.2d 551, 202 P.2d 906, 13 A.L.R.2d 1081 (1949), for the proposition that the police power comprehends the regulation, preservation, promotion and development of natural resources.

In so doing, it misapplies those cases. *Clark, supra,* was a case sustaining as a valid exercise of the police power a regulation of apple grading designed to promote the sale of Washington apples. *State v. Dexter, supra,* sustained as a

valid exercise of the police power a statute requiring logging operators to make provision for reforestation, and an injunction closing a logging operation for noncompliance. Both cases involved the regulation of private interests.

The powers of a state legislature, insofar as they are not limited by constitutional provisions, are plenary. In dealing with state legislation, it is unnecessary to assign a source of power. Because, however, the police power can infringe what would otherwise be rights of property or individual freedoms, its breadth, plus that of natural rights, covers the entire field of human conduct. Even in classical formulations, that breadth is enormous:

> The police of a State, in a comprehensive sense, embraces its whole system of internal regulation, by which the State seeks not only to preserve the public order and to prevent offences against the State, but also to establish for the intercourse of citizens with citizens those rules of good manners and good neighborhood which are calculated to prevent a conflict of rights, and to insure to each the uninterrupted enjoyment of his own so far as is reasonably consistent with a like enjoyment of rights by others.
>
> . . . .
>
> . . . The power we allude to is rather the police power; the power vested in the legislature by the constitution to make, ordain, and establish all manner of wholesome and reasonable laws, statutes, and ordinances, either with penalties or without, not repugnant to the constitution, as they shall judge to be for the good and welfare of the Commonwealth, and of the subjects of the same. It is much easier to perceive and realize the existence and sources of this power than to mark its boundaries, or prescribe limits to its exercise."

"This police power of the State," says another eminent judge, "extends to the protection of the lives, limbs, health, comfort, and quiet of all persons, and the protection of all property within the State. According to the maxim, *Sic utere tuo ut alienum non laedas,* which being of universal application, it must, of course, be within the range of legislative action to define the mode and manner in which every one may so use his own as not to injure others." And again: [By this] "general police power of the State, persons and property are subjected to all kinds

of restraints and burdens, in order to secure the general comfort, health, and prosperity of the State; of the perfect right in the legislature to do which, no question ever was, or, upon acknowledged general principles, ever can be made, so far as natural persons are concerned." (Footnotes omitted.) T. Cooley, Constitutional Limitations 706-08 (5th ed. 1883)

Where the police power is felt in the regulation of private rights and interests, protective constitutional bulwarks must be scrupulously noted and effectuated by the courts. But police power is of little consequence, constitutional or otherwise, in the relations of governmental units *inter se*. Nor is it the police power which operates when government neither regulates nor commands, but exhorts.

It is quite possible that "sovereign power" as that term is used in our precedents is not solely comprehended in taxation, eminent domain, and the police power. But this Commission is a new species in Washington. The *Hamblen* case *supra* sustained our present Legislative Council. The only other case in point in this jurisdiction, *State ex rel. French v. Clausen*, 107 Wash. 667, 182 Pac. 610 (1919), invalidated an appointment to the "Industrial Code Commission," a mixed body of legislators and appointed citizens possessing investigatory powers. As Judge Hill has pointed out, *Hamblen, supra* at 92, the case was vitiated by the *Hamblen* decision.

Our precedents concerning increases in the emoluments of office deal with the traditional offices of state and local government, and are of little help. The records of the Constitutional Convention of 1889 are fragmentary. Those that remain are of no help in determining the reach of article 2, section 13. *See* Journal of the Washington State Constitutional Convention—1889, 531 (1962).

We have interpreted article 2, section 13 as expressing an intent both to preserve a pure public policy by preventing improper bias in the vote of representatives, *State ex rel. O'Connell v. Dubuque*, 68 Wn.2d 553, 567, 413 P.2d 972 (1966), and to prevent the creation of offices to be filled by the creators. *State ex rel. French v. Clausen, supra* at 673-

74. If such is the purpose, it would be more in keeping with sound administration to develop a standard designed to effectuate that purpose than to continue to apply the classic theories of a simpler age.

The result reached by the majority is neither required by our precedents nor justified by sound logic. The institution of judicial review is not a license for this court to substitute for the discretion of the legislature our own ideas of the wise, the usual, or the politic. Where the validity of a statute is assailed, there is a presumption of the constitutionality of the legislative enactment unless its repugnancy to the constitution clearly appears or is made to appear beyond a reasonable doubt. *Clark v. Dwyer, supra; Port of Tacoma v. Parosa,* 52 Wn.2d 181, 324 P.2d 438 (1958). That is not the case here. On the contrary, somewhat disingenuous reasoning has been required to reach the conclusion at which the majority opinion arrives.

Article 2, section 13 is by any analysis one of the lesser anchors of the ship of state; however, it is not to be minimized. It must be administered with a proper standard. I do not believe that the majority has provided that standard. Of a far more weighty provision of the federal constitution, Justice Holmes once remarked:

> Great constitutional provisions must be administered with caution. Some play must be allowed for the joints of the machine, and it must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts. *Missouri, K. & T. Ry. v. May,* 194 U.S. 267, 270, 48 L. Ed. 971, 24 Sup. Ct. 638 (1904).

If legislative efforts to guide the process of growth in our dynamic culture consistently received such Procrustean treatment from this court, our governmental apparatus may attain theoretical elegance, but it is quite unlikely to be responsive to the need of our resourceful society.

Respondents have, in my opinion, failed to meet their burden as to a showing of unconstitutionality. I would grant the writ.