Andrew S. WARWICK, Commissioner of the Department of Administration of the State of Alaska, Appellant,

v.

STATE ex rel. Genie CHANCE, Alaska State Senator and Chairman of the Legislative Council of the Alaska State Legislature, Appellee.

No. 2712.

Supreme Court of Alaska.

March 25, 1976.

William T. Council, Asst. Atty. Gen., and Avrum M. Gross, Atty. Gen., Juneau, for appellant.

Gail Roy Fraties, Gregg, Fraties, Petersen, Page & Baxter, Juneau, for appellee.

Before BOOCHEVER, Chief Justice, and RABINOWITZ, CONNOR, ERWIN and BURKE, Justices.

## OPINION

BOOCHEVER, Chief Justice.

Art. II, sec. 5 of the Alaska Constitution provides in part:

> During the term for which elected and for one year thereafter, no legislator may be nominated, elected, or appointed to any other office or position of profit which has been created, or the salary or emoluments of which have been increased, while be was a member.

By this appeal we are required to construe that provision as applied to a member of the Eighth Legislature who was appointed Commissioner of Administration within the proscribed time period. The Eighth Legislature generally raised salaries, including that of the Commissioner of Administration. Questions as to mootness and the possibility of prospective application of any ruling adverse to Commissioner Warwick are also presented.

On January 8, 1973, Andrew S. Warwick assumed office as a member of the Eighth Alaska State Legislature. His two-year term of office would have expired on January 20, 1975. In April of 1974, the Eighth Alaska State Legislature raised the salary of all state judicial and executive officers, including that of the Commissioner of Administration.[1] The salary of the Commissioner of Administration was increased from $33,000.00 to $40,000.00. On December 9, 1974, Mr. Warwick resigned from the Eighth Alaska State Legislature, and he was subsequently appointed by Governor Hammond to serve as Commissioner of Administration. After confirming the appointment of Andrew Warwick as Commissioner of Administration on May 21, 1975, the legislature indicated its intent to bring suit to test Warwick's eligibility for the post under the Alaska Constitution.[2] The Chairman of the Legislative Council of the Alaska State Legislature, on behalf of the state, filed the suit on September 8, 1975. The case was commenced in the Supreme Court as an "Original Application for an Action in the Nature of a Writ Quo Warranto". We remanded the case to the superior court to be handled on an expedited basis. The trial court granted summary judgment in favor of plaintiffs on November 3, 1975. This appeal followed. The facts are not in dispute.

We are faced with three issues on this appeal: (1) was Andrew Warwick's appointment as Commissioner of Administration invalid under art. II, sec. 5 of the Alaska Constitution; (2) if Mr. Warwick's initial appointment was invalid, did a subsequent pay increase enacted by the Ninth Alaska State Legislature render this appeal moot and (3) if the first two issues are resolved against appellant, should this court apply its decision prospectively only, so as to except Andrew Warwick from its effect.

In a prefatory opinion and order dated January 8, 1976, the issues were resolved contrary to the position taken by Mr. Warwick. We affirmed the judgment of the superior court and indicated that a full opinion would be filed on a later date.

## I

Mr. Warwick contends that a showing of improper intent is required before the prohibition of Alaska Constitution art. II, sec. 5 becomes applicable. Under such a construction, it would be necessary to prove that an individual legislator supported a

---

1. Ch. 34, SLA 1974.

2. Senate Concurrent Resolution No. 36 am., Ninth Legislature—First Session.

pay raise with the intention to benefit personally therefrom.

Although this is a case of first impression in Alaska, similar constitutional provisions have been interpreted and applied in other states on numerous occasions.[3] There is little disagreement as to the purpose of the type of constitutional provision under consideration here. Although the exact language varies from state to state,[4]

3. 17 Ops.Atty.Gen. (U.S.) 365 (1882); *Kederick v. Hentzleman*, 132 F.Supp. 582, 15 Alaska 582 (1955); *Opinion of the Justices*, 279 Ala. 38, 181 So.2d 105 (1965); *Opinion of the Justices*, 244 Ala. 386, 13 So.2d 674 (1943); *Montgomery v. State*, 107 Ala. 372, 18 So. 157 (1895); *State v. Porter*, 1 Ala. 688; *State v. Myers*, 89 Ariz. 167, 359 P.2d 757 (1961); *Carter v. Commission on Qualifications of Judicial Appointments*, 14 Cal.2d 179, 93 P.2d 140 (1939); *In re Advisory Opinion to the Governor*, 225 So.2d 512 (Fla. 1969); *Adams v. Mathews*, 156 So.2d 515 (Fla.1963); *In re Advisory Opinion to the Governor*, 132 So.2d 1 (Fla.1961); *State v. Gray*, 74 So.2d 114 (Fla.1954); *State v. Gay*, 28 So.2d 901 (Fla.1947); *State v. Wiseheart*, 158 Fla. 267, 28 So.2d 589 (1946); *Advisory Opinion to the Governor*, 22 So.2d 458 (Fla.1945); *State v. Futch*, 122 Fla. 837, 165 So. 907 (1936); *Davis v. Crawford*, 95 Fla. 438, 116 So. 41 (1928); *Advisory Opinion to the Governor*, 94 Fla. 620, 113 So. 913 (1927); *Sheffield v. State School Bldg. Authority*, 208 Ga. 575, 68 S.E.2d 590 (1952); *Bulgo v. Enomoto*, 50 Haw. 61, 430 P.2d 327 (1967); *State v. Gooding*, 22 Idaho 128, 124 P. 791 (1912); *Taylor v. Commonwealth*, 305 Ky. 75, 202 S.W.2d 992 (1947); *Meridith v. Kauffman*, 293 Ky. 395, 169 S.W.2d 37 (1943); *Kimble v. Bender*, 73 Md. 608, 196 A. 409 (1938); *Mayor and Commissioners v. Green*, 144 Md. 85, 124 A. 403 (1923); *State Tax Commission v. Harrington*, 126 Md. 157, 94 A. 537 (1915); *Opinion of the Justices*, 348 Mass. 803, 202 N.E.2d 234 (1964); *In re Opinion of the Justices*, 303 Mass. 615, 21 N.E.2d 551, 557 (1939); *Fyfe v. Mosher*, 149 Mich. 349, 112 N.W. 725 (1907); *Dickenson v. Holm*, 243 Minn. 34, 65 N.W.2d 654 (1954); *Miller v. Holm*, 217 Minn. 166, 14 N.W.2d 99 (1944); *State v. Erickson*, 180 Minn. 246, 230 N.W. 637 (1930); *State v. Schmahl*, 125 Minn. 104, 145 N.W. 794 (1914); *State v. Scott*, 105 Minn. 513, 117 N.W. 1044 (1908); *State v. Sutton*, 63 Minn. 147, 65 N.W. 262 (1895); *Brady v. West*, 50 Miss. 68 (1874); *Shelby v. Alcorn*, 36 Miss. 273, 72 Am.Dec. 169 (1858); *State v. Guy*, 107 N.W.2d 211 (N.D.1961); *Baird v. Lefor*, 52 N.D. 155, 201 N.W. 997 (1924); *State v. Ferguson*, 142 Ohio St. 496, 52 N.E.2d 980 (1944); *Gragg v. Dudley*, 143 Okl. 281, 289 P. 254 (1930); *Baskin v. State*, 107 Okl. 272, 232 P. 388 (1925); *Gibson v. Kay*, 68 Or. 589, 137 P. 864, 867 (1914); *State v. Ostroot*, 75 S.D. 319, 64 N.W.2d 62 (1954); *Palmer v. State*, 11 S.D. 78, 75 N.W. 818 (1898); *Hall v. Baum*, 452 S.W.2d 699 (Tex.1970), appeal dismissed, 397 U.S. 93, 90 S.Ct. 818, 25 L.Ed.2d 79 (1970); *Spears v. Davis*, 398 S.W.2d 921 (Tex.1966); *Kothmann v. Daniels*, 397 S.W.2d 940 (Tex.Civ.App.1965); *Romney v. Barlow*, 24 Utah 2d 226, 469 P. 2d 497 (1970); *Shields v. Toronto*, 16 Utah 2d 61, 395 P.2d 829 (1964); *State v. Grover*, 102 Utah 41, 125 P.2d 807 (1942); *Anderson v. Chapman*, 86 Wash.2d 189, 543 P.2d 229 (1975); *Oceanographic Commission v. O'Brien*, 74 Wash.2d 904, 447 P.2d 707 (1968); *State v. Dubuque*, 68 Wash.2d 553, 413 P.2d 972 (1966); *State v. Munro*, 52 Wash.2d 522, 327 P.2d 729 (1958); *State v. Yelle*, 29 Wash.2d 68, 185 P.2d 723 (1947); *State v. Hall*, 26 Wash.2d 172, 173 P.2d 153 (1946), overruled in *State v. Dubuque, supra; State v. Reeves*, 196 Wash. 145, 82 P.2d 173 (1938); *State v. Clausen*, 107 Wash. 667, 182 P. 610 (1919); *State v. Nye*, 148 Wis. 659, 135 N.W. 126 (1912); *State v. Boyd*, 21 Wis. 208 (1866); *Brimmer v. Thomson*, 521 P.2d 574 (Wyo.1974).

4. Some states specifically exempt elective offices. *See*, for example, Alabama Constitution art. IV, § 59; California Constitution art. IV, § 13; Indiana Constitution art. IV, § 30; Iowa Constitution art. III, § 21; Kentucky Constitution § 44; Maine Constitution art. IV, part 3, § 10; Mississippi Constitution art. IV, § 45; Nevada Constitution art. IV, § 8; Oregon Constitution art. IV, § 30. Other constitutions only prohibit appointments, and make no reference to elective offices. *See*, for example, Delaware Constitution art. II, § 14; Georgia Constitution art. III, § 4, ¶ 6; Massachusetts Constitution, Amendment art. LXV; New York Constitution art. III, § 7. Many states limit the prohibition to "civil offices". *See*, for example, Delaware, *supra*; Florida Constitution, art. III, § 5; Georgia Constitution, *supra*; Indiana Constitution, *supra*; Iowa Constitution, *supra*; Maine Constitution, *supra*; Nevada Constitution, *supra*; New Jersey Constitution art. IV, § V, ¶ 1; New Mexico Constitution art. IV, § 28; New York Constitution art. III, § 7; North Dakota Constitution art. II, § 39; Ohio Constitution art. II, § 19; Oregon Constitution, *supra*; South Dakota Constitution art. III, § 12;

all such provisions are aimed at a common goal: to remove improper motives from considerations of legislators in voting for increased salaries or the creation of new offices.[5] In one often-cited quotation,[6] Justice Story, commenting upon a like provision in the Constitution of the United States, said:

> The reasons for excluding persons from offices who have been concerned in creating them, or increasing their emoluments, are to take away, as far as possible, any improper bias in the vote of the representative, and to secure to the constituents some solemn pledge of his disinterestedness.[7]

This type of constitutional provision is designed not only to stop overt trafficking in offices, but also to prevent less obvious influences on a legislator's actions:

> [T]his constitutional provision was enacted through fear that a legislator might be, *either consciously or unconsciously, influenced by selfish motives when voting for or against a bill.* (emphasis by the court)[8]

Another purpose has been said to be the elimination of even the suspicion that legislators were acting with improper motives.[9] As in the case of the judiciary,[10] it is important that the legislature not only avoid impropriety, but also the appearance of impropriety.

In applying this type of constitutional provision, the courts have been aware of a number of *contra* policy considerations, primarily based on the nature of

---

5. *See In re Advisory Opinion to the Governor*, 225 So.2d 512, 514 (Fla.1969); *State v. Gay*, 158 Fla. 465, 28 So.2d 901, 903 (1947); *State v. Wiseheart*, 158 Fla. 267, 28 So.2d 589, 592 (1946); *State v. Gooding*, 22 Idaho 128, 124 P. 791, 792, 793 (1912); *Meridith v. Kauffman*, 293 Ky. 395, 169 S.W.2d 37, 38 (1943); *Mayor and Commissioners v. Green*, 144 Md. 85, 124 A. 403, 404 (1923); *State v. Erickson*, 180 Minn. 246, 230 N.W. 637, 638 (1930); *State v. Sutton*, 63 Minn. 147, 65 N.W. 262, 263 (1895); *State v. Guy*, 107 N.W.2d 211, 218 (N.D.1961); *Hall v. Baum*, 452 S.W.2d 699, 703 (Tex.1970); *State v. Grover*, 102 Utah 41, 125 P.2d 807, 811–12 (1942); *State v. Clausen*, 107 Wash. 667, 182 P. 610, 612 (1919).

Texas Constitution art. III, § 18; Utah Constitution art. 6, § 7; Washington Constitution art. II § 13; West Virginia Constitution art. VI, § 15; Wisconsin Constitution art. IV, § 12. Furthermore, although most constitutions prohibit either elections or appointments only during the term for which a legislator was elected, other states besides Alaska extend the prohibited period one year beyond the legislator's term. *See*, for example, Kentucky Constitution § 44; Minnesota Constitution art. IV, § 9; Nevada Constitution art. IV, § 8; New Mexico Constitution art. IV, § 28; Ohio Constitution art. II, § 19. Finally, only one other constitution prohibits even the nomination to the prohibited positions, that state being New Jersey. *See* New Jersey Constitution art. IV, § V, ¶ 1.

6. *See*, for example, *State v. Gray*, 74 So.2d 114, 116 (Fla.1954); *Kimble v. Bender*, 173 Md. 608, 196 A. 409, 415 (1938); *Oceanographic Commission v. O'Brien*, 74 Wash.2d 904, 447 P.2d 707, 712 (1968); *State v. Dubuque*, 68 Wash.2d 553, 413 P.2d 972, 981 (1966); *State v. Boyd*, 21 Wis. 208, 212 (1866).

7. Story, Story on the Constitution, 5th ed., Vol. I, § 867. Story went on to comment:
The actual provision, however, does not go to the extent of the principle; for his appointment is restricted only during the time for which he was elected, thus leaving in full force every influence upon his mind, if the period of his election is short, or the duration of it is approaching its natural termination.

8. *State v. Grover*, 102 Utah 41, 125 P.2d 807, 813 (1942), quoting from *Norbeck & Nicholson Co. v. State*, 32 S.D. 189, 142 N.W. 847, 849 (1913). *See also Fyfe v. Kent County Clerk*, 149 Mich. 349, 112 N.W. 725, 726 (1907) (purpose of these provisions is "to preserve a pure public policy"); *Brady v. West*, 50 Miss. 68, 76 (1874) (provision designed to preserve the purity of legislation).

9. *See*, for example, *Palmer v. State*, 11 S.D. 78, 75 N.W. 818, 819 (1898); *Baskin v. State*, 107 Okl. 272, 232 P. 388, 390 (1925).

10. Canon 2 of the Code of Judicial Conduct specifies that "[A] judge shall avoid impropriety or the appearance of impropriety in all his activities".

the democratic process. First, the courts have favored the eligibility of citizens to seek public office, especially elective office.[11] The courts have reasoned that one of the fundamental rights of citizenship is the right to vote, embodying the right of free choice of candidates. Restrictions on those who may run for office impinge on that right.[12] A related reason often given is that our political system favors the participation of the citizenry in public affairs.[13] Some courts have indicated that the continuation in public service by an experienced person is another important consideration.[14]

For such reasons, many courts have adopted a literal construction of this type of constitutional provision,[15] but few have expanded on the express wording.[16] In upholding eligibility of an officer, courts have shown a preference for eligibility to elective offices over appointive positions.[17]

11. *Begich v. Jefferson*, 441 P.2d 27, 35 (Alaska 1968); *Carter v. Commission on Qualifications of Judicial Appointments*, 14 Cal.2d 179, 93 P.2d 140, 142 (1939); *State v. Schmahl*, 125 Minn. 104, 145 N.W. 794, 795 (1914); *State v. Dubuque*, 68 Wash.2d 553, 413 P.2d 972, 980 (1966); *Brimmer v. Thomson*, 521 P.2d 574, 580 (Wyo.1974).

12. *See Shields v. Toronto*, 16 Utah 2d 61, 395 P.2d 829, 832 (1964); *Brimmer v. Thomson*, 521 P.2d 574, 578–79 (Wyo.1974).

13. *See* note 11, *supra*.

14. *See* for example, *Shields v. Toronto*, 16 Utah 2d 61, 395 P.2d 829, 834 (1964); *State v. Gray*, 74 So.2d 114, 117–18 (Fla. 1954). This was also a consideration in the minds of some of the members of the Alaska Constitutional Convention. *See, e. g.*, the statement of Mr. Riley, 3 Alaska Constitutional Convention Proceedings at 1802.

15. *See*, for example, *State v. Gay*, 28 So.2d 901, 903 (Fla.1947); *Dickenson v. Holm*, 243 Minn. 34, 65 N.W.2d 654, 655 (Minn. 1954); *State v. Sutton*, 63 Minn. 147, 65 N.W. 262, 263 (1895); *Shelby v. Alcorn*, 36 Miss. 273, 72 Am.Dec. 169, 175–76 (Miss. 1858); *Baskin v. State*, 107 Okl. 272, 232 P. 388, 389 (1925); *Palmer v. State*, 11 S.D. 78, 75 N.W. 818, 819 (1898); *State v. Grover*, 102 Utah 41, 125 P.2d 807, 811 (1942).

16. *See Shields v. Toronto*, 16 Utah 2d 61, 395 P.2d 829 (1964); *State v. Ostroot*, 75 S.D. 319, 64 N.W.2d 62 (1954), and *State v. Gray*, 74 So.2d 114 (Fla.1954).

17. The following state court decisions have upheld eligibility for an elective office: Alabama: *Opinion of the Justices, supra*: California: *Carter v. Commission on Qualifications of Judicial Appointments, supra*; Florida: *Adams v. Matthews, supra*; *State v. Gray, supra*; *Davis v. Crawford, supra*; Hawaii: *Bulgo v. Enomoto, supra*; Minnesota: *State v. Scott, supra*; *State v. Schmahl, supra*; North Dakota: *State v. Guy, supra*; Oklahoma: *Gragg v. Dudley*,

*supra*; South Dakota: *State v. Osteroot, supra*; Texas: *Spears v. Davis, supra*; *Kothmann v. Daniels, supra*; Utah: *Shields v. Toronto, supra*; Washington: *State v. Dubuque, supra*; Wisconsin: *State v. Boyd, supra*; Wyoming: *Brimmer v. Thomson, supra*.

In comparison, only six courts have clearly denied eligibility to an elective office: D. Alaska: *Kederick v. Heintzleman, supra*; Minnesota: *State v. Erickson, supra*; *Miller v. Holm, supra*; Texas: *Hall v. Baum, supra*; Washington: *Anderson v. Chapman, supra*. *State v. Gay*, 28 So.2d 901 (Fla. 1947), although denying eligibility to a nominally elective office was not a situation of a "true" election, since the defendant, Senator Fraser, was appointed by the executive committee of his political party and ran unopposed. *See State v. Gray*, 74 So.2d 114, 119 (Fla.1954), where the Florida court discusses this distinction between its holding in the two cases. The only other case denying eligibility to an elective office was *State v. Hall*, 26 Wash.2d 172, 173 P.2d 153 (1946), which was overruled in *State v. Dubuque*, 68 Wash.2d 553, 413 P.2d 972 (1966).

In contrast, cases dealing with eligibility to appointive offices are fairly evenly split. Cases which have held that the appointment was invalid are: Alabama: *Opinion of the Justices*, 244 Ala. 386, 13 So.2d 674 (1943); *Montgomery v. State, supra*; *State v. Porter, supra*; Florida: *Advisory Opinion to the Governor, supra;* In re *Advisory Opinion to the Governor, supra*; Kentucky: *Taylor v. Commonwealth, supra*; Maryland: *Kimble v. Bender, supra*; Massachusetts: *Opinion of the Justices, supra;* In re *Opinion of the Justices, supra*; Michigan: *Fyfe v. Mosher, supra*; Minnesota: *State v. Sutton, supra;* Mississippi: *Shelby v. Alcorn, supra*; Oklahoma: *Baskin v. State, supra*; Oregon: *Gibson v. Kay, supra*; South Dakota: *Palmer v. State, supra*; Utah: *Romney v. Barlow, supra*; *State v. Grover, supra*; Washington: *State v. Clausen, supra*; *Oceanographic Commission v. O'Brien, supra*. The following cases upheld eligibility to an

Preference for eligibility to elective office might be regarded as some indication that the legislator's intent should be a consideration, since the courts sometimes rely in part on the electorate's ability to judge the candidates' motives at the polls.[18] Aside from this tangential support, we have been unable to find any case which even impliedly indicates that the motives of an individual legislator in voting for the bill which created an office he later assumed or increased the emoluments thereof should be directly considered.

Mr. Warwick relies heavily on the case of *Shields v. Toronto*, 16 Utah 2d 61, 395 P.2d 829 (1964). There, in an opinion to which Chief Justice Henriod strongly dissented, the court found that the Utah constitutional provision preventing appointment or election to an office "which shall have been created or the emoluments of which shall have been increased during the term for which he was elected" was inapplicable to candidates for election to the offices of governor and secretary of state.

The court found that the statute in question was for the purpose of overhauling and consolidating salary statutes, and that the small increase in salaries was merely incidental to this other purpose. The purport of the opinion was that there was no objective evidence from which it could be determined that any legislator could have had an improper motive in voting for the bill, and the court made no effort to examine the intent of the individual legislators who became candidates for the offices.[19] Thus the case furnishes no support for Mr. Warwick's contention that this court should examine his individual intent and, in the absence of a showing of an improper motive on his part, exempt him from the coverage of the constitutional provision.

The *Schields* case also relied heavily on the fact that the offices involved were elective: "that all that has been done has had full exposure to public view, and that these candidates have had full exposure to the elective process".[20] In Mr. Warwick's

appointive office for the indicated reasons: Alabama: *Opinion of the Justices*, 279 Ala. 38, 181 So.2d 105 (1965) (judgeship was an elective office and appointment thereto fit exception in constitution); Arizona: *State v. Myers, supra* (appointee to judgeship was not a member of the legislature since he was elected but never seated); Florida: *In re Advisory Opinion to the Governor*, 132 So.2d 1 (Fla.1961) (director appointed by a board of conservation was an administrative employee and not a "civil officer"); *State v. Wiseheart, supra* (challenge to appointment of judge could not be brought after expiration of time during which constitution prohibits his appointment); *State v. Futch, supra* (appointment as attorney for state racing commission not a "civil office"); Georgia: *Sheffield v. State School Building Authority, supra* (appointment to school building authority board not a "civil office"); Idaho: *State v. Gooding, supra* (legislation only enabled voters to elect to have a district highway commission; office of commissioner not "created" until district organized); Kentucky: *Meridith v. Kauffman, supra* (act creating the appointee's office was passed before he was elected to the legislature to fulfill unexpired term of member who died in office); Maryland: *State Tax Commission v. Harrington, supra* (general counsel to

state tax commission not a "civil office"); *Mayor and Commissioners v. Green, supra* (statute changing city clerk from elective to appointed position did not "create" a position and the legislature did not increase the salary); North Dakota: *Baird v. Lefor, supra* (receiver of insolvent bank appointed by the court was not a holder of "civil office"); Ohio: *State v. Ferguson, supra* (appointment to post-war program commission not "civil office"); Washington: *State v. Yelle, supra* (appointment to legislative fact finding committee sitting between sessions not a "civil office"); *State v. Reeves, supra* (legislation establishing retirement benefits for judges did not constitute an increase in the "emoluments" of the office); Wisconsin: *State v. Nye, supra* (statute which changed the manner of payment but not the rate did not increase "emoluments" of office of grain commissioner).

18. See *Shields v. Toronto*, 16 Utah 2d 61, 395 P.2d 829, 831–32 (1964); *State v. Gray*, 74 So.2d 114, 117 (Fla.1954); *Spears v. Davis*, 398 S.W.2d 921, 929 (Tex.1966); *State Davis*, 398 S.W.2d 921, 929 (Tex.1966); *State v. Ostroot*, 75 S.D. 319, 64 N.W.2d 62, 65–66 (1954).

19. 395 P.2d at 835.

20. *Id.* at 831.

case, we are concerned with an appointive position.

■ The terms of art. II, sec. 5 of the Alaska Constitution are clear and unambiguous. The purpose sought to be accomplished by that section is not merely to prevent an individual legislator from profiting by an action taken by him with bad motives, but to prevent all legislators from being influenced by either conscious or unconscious selfish motives. There is nothing in the provision making its restriction dependent on the intent of an individual legislator in voting for the bill in question.

■ Mr. Warwick, however, further contends that the purpose of the act as applied to the legislature as a whole is no longer pertinent since the passage of the Public Employment Relations Act (P.E.R. A.), AS 23.40.070 et seq. which recognizes the right of public employees to bargain collectively. He argues that since pay raises for public employees are now initiated by the pressures created by bargains between the representatives of the employees and the administrator, the evils sought to be prevented by the constitutional provision are no longer present. The monetary terms of any agreement entered into under the P.E.R.A. are subject to funding through legislative appropriation.[21] We need not pass on the question of whether such action by the legislature is sufficient to activate the constitutional prohibition, for the P.E.R.A. does not apply to the office here involved. The decision whether

to increase the salary of the Commissioner of Administration, and, if so, to what extent over that of other state employees was in the legislature's discretion. This discretionary function of the legislature is exactly the same as that contemplated at the time the Constitution was enacted, and we see no compelling reason to construe the language due to changed times and circumstances so as to vary its literal terms.[22] This is not a situation similar to that confronted by this court in *Wade v. Nolan*, 414 P.2d 689 (Alaska 1966), cited by Warwick. In *Wade*, we were faced with a provision for reapportionment of the Senate by a method common to many other states which, after passage of our constitution, was held by the United States Supreme Court to be in violation of the United States Constitution. That situation could not have been anticipated by the delegates to the Constitutional Convention, and the doctrine of supremacy of the United States Constitution prevented application of the Alaska Constitution as drafted.

■ Although we join in the views of many experts who consider our constitution, in most respects, to be a paradigm for state constitutions,[23] we do not construe it to be a static document. Like its federal counterpart, it must be considered as a living document adaptable to changing conditions and circumstances unanticipated at the time it was written.[24] As applied to this case, the intent and purpose of the provision involved is as cogent today as it was in 1955, and we hold that the clear

21. AS 23.40.215.

22. In 1955 at the time of the Constitutional Convention, there had already been a long history of successive increases in the salaries of state officers, and the members of the Convention must have been aware that such salaries would be likely to be increased by subsequent legislatures. Territorial legislatures consistently increased salaries for state officers during the biennial sessions from 1943 through the First Extraordinary Session of 1955 as shown in Appendix A.

23. *See*, for example, Bebout, J., "Charter for the Last Frontier: Alaska Constitutional Convention Delegates Followed Best Practice, Avoided Mistakes of U. S. Experience," 45

Nat.Munic.R. 158 (April 1956); Hellenthal, J., "Alaska's Heralded Constitution: The 49th State Sets an Example," 44 Am.Bar Assn.J. 1147 (Dec. 1958); Eyinck, D., "Alaska—The 49th State? Alaskans Write Outstanding Constitution," Am.City 168 (Sept. 1956); Bartholomew, P., "Constitution of the State of Alaska," 40 Southwestern Soc. Science Q. 40 (June 1959).

24. *Juillard v. Greenman* (Legal Tender Case), 110 U.S. 421, 4 S.Ct. 122, 28 L.Ed. 204, 211 (1884); *Knox v. Lee* and *Parker v. Davis* (Legal Tender Cases), 12 Wall. 457, 20 L.Ed. 287, 306 (1870); *Cohens v. Virginia*, 6 Wheat. 264, 387, 5 L.Ed. 257, 287 (1821); *Martin v. Hunter's Lessee*, 1 Wheat. 304, 326–27, 4 L.Ed. 97, 103 (1816).

language of art. II, sec. 5 proscribes Mr. Warwick's appointment during the period of the term for which he was elected and one year thereafter to an office, the salary of which was increased by the legislature of which he was a member.

## II

We next consider the issue of mootness. Mr. Warwick was a member of the Eighth Alaska State Legislature which in April 1974 passed Ch. 34, SLA 1974 increasing the salary of the Commissioner of Administration from $33,000.00 to $40,000.00. The Ninth Legislature passed Ch. 205, SLA 1975 effective July 1, 1975 which further increased that salary by placing it at ten percent above the amount established for Step E, Range 28 of a salary schedule.

■ Mr. Warwick argues that regardless of the merits of his original appointment, the issue has become moot for the reason that since July 1, 1975, he has not been paid the salary established by the Eighth Legislature, of which he was a member. This argument approaches the question from the wrong end. We do not look to events subsequent to the appointment but to the legality of the appointment itself. If illegal at the time it was made, no subsequent act of the Ninth Legislature could make the appointment legal.

■ . Moreover, the mootness argument, like that addressed to the constitutionality of the appointment itself, misses the point as to the purpose of the prohibition. That purpose is to prevent the possibility of a legislator's improper motivation in voting for a salary increase. That a subsequent legislature could either increase or decrease the salary cannot affect the possible motives of the members of the earlier legislature. The subsequent actions are thus irrelevant to the purpose sought to be accomplished by the constitutional provision. The prohibition must be construed as applying for the full statutory period re-

gardless of the acts of subsequent legislatures.[25]

Judge Carlson in his scholarly opinion refers to the Florida Supreme Court case of *State v. Gay*, 28 So.2d 901 (Fla.1947) as being closely analogous. Article III, sec. 5 of the Florida Constitution provides:

No senator or member of the House of Representatives shall during the time for which he was elected, be appointed or elected to any civil office under the Constitution of this State, that has been created, or the emoluments whereof shall have been increased during such time.

Fraser was a member of the Senate which raised the salary of Comptroller, an office to which he was subsequently elected, prior to the expiration of his term as senator. He contended that the constitutional prohibition did not apply to him because the legislature had passed an act providing that any member of the legislature who, during the time for which he was elected, is appointed or elected to an office referred to in the constitutional provision, shall receive during the term for which he was elected or appointed to the civil office the salary which was in effect at the commencement of his term in the legislature.

Thus it appeared that Fraser could not have profited from the increase in salary enacted by the legislature of which he was a member. Nevertheless, the Florida court stated:

Section 5 of Article III of the Constitution in words as clear as can be stated bars any member of the Senate or House of Representatives from election or appointment to certain civil offices during the time for which he was elected to the legislature and the office of Comptroller is, by reason of the salary raise in Chapter 22913 within the forbidden class. The terms of Section 5, Article III are so clear and direct that they defy misinterpretation.[26]

25. The same situation, however, would not necessarily apply to a subsequent repeal of a salary increase by the legislature of which the person appointed to office was a member, if such repeal were enacted while he was a member. The repeal could then possibly be construed as nullifying the original action.

26. 28 So.2d at 902.

The court held:

> The relator was a member of the Senate that raised the Comptroller's salary, his term does not expire till November 1948, so he is clearly within the class declared to be ineligible for election or appointment to another civil office by resigning from the legislature. If this be true certainly it [the legislature] cannot avoid the constitutional prohibition by remitting the raise in salary for the period of this election to the legislature.[27]

Counsel for Mr. Warwick also refers to the circumstances under which Senator William Saxbe was appointed Attorney General of the United States. During his senatorial term, which ran until January 2, 1975, the compensation of the office of Attorney General was increased from $35,000.00 to $60,000.00.[28] The United States Constitution prohibits a senator from being appointed during the time for which he was elected to any civil office of the United States the emoluments of which were increased during such time.[29] In order for Saxbe to serve as Attorney General, Congress enacted a law[30] which provided that the emoluments of the office of Attorney General would be those in effect prior to the commencement of Saxbe's senate term, and that the salary would remain at that level until January 2, 1975.

 There are two principal reasons why we fail to find the Saxbe example persuasive. First, while Saxbe was a member of Congress, steps were taken to assure that he could not profit from the salary increase passed during his term in the senate; Mr. Warwick was able to enjoy the increase in salary enacted by the Eighth Legislature, at least until the further increase passed by the Ninth Legislature. More importantly, the matter was never tested in the courts, and it is a matter of conjecture as to whether or not the appointment would have been upheld. Considering the purposes for passage of the Alaska constitutional provision, we hold that the subsequent salary increase enacted by the Ninth Legislature did not moot this appeal.[31]

### III

Mr. Warwick argues that any adverse decision on the merits should have purely prospective effect; in other words, a decision that Warwick's appointment was invalid should not be applied to any appointments, including Warwick's, prior to our decision.

 A state supreme court has unfettered discretion to apply a particular ruling either purely prospectively, purely retroactively, or partially retroactively, limited only "by the juristic philosophy of the judges . . . , their conceptions of law, its origin and nature".[32] The decision is not a matter of law, but a determination based on weighing the merits and demerits of each case.[33] Consideration is given to

---

27. 28 So.2d at 903.

28. 5 U.S.C.A. § 5312, 1969 Amendment.

29. United States Constitution, art. I, sec. 6, clause 2.

30. P.L. 93–178, sec. 1, 87 Stat. 697.

31. Under a closely analogous situation, the Massachusetts Supreme Court reached a similar conclusion in Opinion of the Justices, 348 Mass. 803, 202 N.E.2d 234 (1964). A subsequent decrease to the prior salary level soon after the disputed appointment was held to be without significance in deciding the eligibility of a legislator to the prohibited office.

32. *Great Northern R. Co. v. Sunburst Oil & Refining Co.*, 287 U.S. 358, 365, 53 S.Ct. 145, 149, 77 L.Ed. 360, 367 (1932). *See also Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965) ; *Judd v. State*, 482 P.2d 273 (Alaska 1971) ; *Schreiner v. Fruit*, 519 P.2d 462, 466–67 (Alaska 1974). The history of prospective rulings has been extensively discussed in prior opinions of this court. *See*, for example, *Rutherford v. State*, 486 P.2d 946, 952–56 (Alaska 1971) ; *Judd v. State, supra; Gray v. State*, 463 P. 2d 897, 912–13 (Alaska 1970). *See also* discussion by the United States Supreme Court in *Linkletter v. Walker, supra*.

33. *See*, for example, *Chevron Oil Co. v. Huson*, 404 U.S. 97, 105–09, 92 S.Ct. 349, 354–356, 30 L.Ed.2d 296, 305–07 (1971) ; *Schreiner v. Fruit, supra*, 519 P.2d at 466–67.

applying a ruling prospectively "whenever injustice or hardship will thereby be averted".[34]

■ Although the problem of determining whether a ruling should be prospective or retrospective is usually dealt with in criminal cases,[35] it arises equally in other areas.[36] Considerations to be applied to non-criminal cases were expressed by the United States Supreme Court in *Chevron Oil Company v. Huson*, 404 U.S. 97, 106, 92 S.Ct. 349, 355, 30 L.Ed.2d 296, 306 (1971) quoted with approval in *Schreiner v. Fruit*, 519 P.2d 462, 466–67 (Alaska 1974):

> In our cases dealing with the nonretroactivity question, we have generally considered three separate factors. First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed. Second, it has been stressed that "we must . . . weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis

in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity". (citations omitted).

While we do not consider any such tests as those outlined above to be binding on the court in all cases, the criteria can be considered here. In such an analysis, we must first determine whether we have overruled clear past precedent or have decided an issue of first impression whose resolution was not clearly foreshadowed.

The only precedent relied upon by Mr. Warwick is an unreported superior court decision upholding an appointment of a legislator made under very similar circumstances to the subject case. In *Jefferson v. Strandberg*,[37] the superior court held that art. II, sec. 5 of Alaska's Constitution was not a bar to Mr. Strandberg's appointment to the office of Commissioner of Public Works within the prohibited time period, although he had been a member of a legislature which had increased the salary of that office. The superior court opinion as reported in counsel's brief turned on the fact that there had been a general pay increase for all state officers and employees. In addition to the *Strandberg* case, reliance was placed on a former attorney general's opinion[38] and an opinion of the present attorney general.[39]

■ It is obvious that these authorities do not have the binding effect of an opinion of the highest state court. In *United States v. Donnelly*, 397 U.S. 286, 295, 90

---

34. *Great Northern R. Co. v. Sunburst Oil & Refining Co., supra*, 287 U.S. at 364, 53 S.Ct. at 148, 77 L.Ed. at 366. *See also Linkletter v. Walker, supra*, 381 U.S. at 625, 83 S.Ct. at 1735, 14 L.Ed.2d at 606.

35. *See*, for example, *Rutherford v. State, supra*, 486 P.2d at 952–56; *Judd v. State, supra; Gray v. State, supra; Thessen v. State*, 508 P.2d 1192, n. 15 at 1195 (Alaska 1973); *Linkletter v. Walker, supra;* and *Desist v. United States*, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969).

36. *See*, for example, *Kaatz v. State*, 540 P.2d 1037 (Alaska 1975) (adoption of comparative negligence); *Schreiner v. Fruit, supra* (recognition of wife's right to sue for loss of consortium; compulsory joinder of

claims); *Chevron Oil Co. v. Huson, supra* (admiralty law not applicable to personal injury actions under Outer Continental Shelf Lands Act—overturning line of federal court decisions); *United States v. Donnelly*, 397 U.S. 286, 90 S.Ct. 1033, 25 L.Ed.2d 312 (1970) (construction of tax statute).

Solely prospective application is also applicable to constitutional rulings. *See*, for example, *Linkletter v. Walker, supra; Chevron Oil Co. v. Huson, supra.*

37. 68–1654D (Superior Court, 3rd Judicial District, 1969).

38. 1968 Op.Atty.Gen., No. 1.

39. Letter from Avrum M. Gross, Attorney General, to the Hon. Chancey Croft, President of the Senate, February 21, 1975.

S.Ct. 1033, 1038, 25 L.Ed.2d 312, 319 (1970), the United States Supreme Court refused to consider a single Sixth Circuit Court of Appeals opinion as justifying reliance upon a clear precedent, stating:

> Deviant rulings by circuit courts of appeals, particularly in apparent dictum, cannot generally provide the "justified reliance" necessary to warrant withholding retroactive application of a decision construing a statute as Congress intended it.

On the other hand, in *Chevron Oil Co. v. Huson, supra,* a line of Fifth Circuit Court of Appeals decisions was held to constitute sufficient precedent for reliance. Here there was an arguable basis for reliance on the unreported superior court opinion in *Strandberg* plus the attorney generals' opinions.

In addition to the doctrine of reliance on past precedent, there is another reason to reach the prospectivity issue. In *Allen v. State Board of Elections,* 393 U.S. 544, 572, 89 S.Ct. 817, 835, 22 L.Ed.2d 1, 20–21 (1968), the United States Supreme Court stated that purely prospective application should be considered when a case presented a complex issue of first impression subject to rational disagreement. This is an issue of first impression for the court since it has not been called upon to interpret this provision of art. II, sec. 5 of the Alaska Constitution before. The issue, however, is not complex, although the superior court decision and attorney generals' opinions referred to create doubt as to the construction of the provision and show that its interpretation was subject to rational disagreement. Assuming arguendo that this is a constitutional issue of first impression subject to rational disagreement, the resolution of which was not clearly foreshadowed, we are then called upon to look to the equities of the case before us to decide whether our ruling should apply prospectively only.

As to the second criteria quoted in *Schreiner,* whether a retrospective or prospective ruling would further the purpose of the new principle of law pronounced by the court, we find little applicability here because the purpose can be accomplished whether or not we apply our holding prospectively. The purpose of the constitutional provision aimed at preventing improper motivation of legislators may be furthered by prohibiting any legislator, including Mr. Warwick, from being appointed to an office in contravention of its terms.

At the same time, it may be argued that that purpose may be adequately fulfilled by announcing a rule to apply only in the future, as it would prevent any subsequent violation. We do not have the type of situation discussed in *Chevron Oil Co. v. Huson, supra.* There the court found that the purpose of a certain statutory enactment was to facilitate an employee's right to recover for injuries suffered on the job. Thus when the court interpreted the statutory enactment so that the statute of limitations would bar the employee's claim for injuries, it refused to apply that decision retroactively, in part because it would not further the purpose of the statute.

The final major consideration in noncriminal cases is whether a holding of retroactivity would cause substantial inequitable results, injustice or harm.[40] It was this consideration which principally motivated Justice Cardozo in his advocacy of prospectivity. He stated:

> [I]n the vast majority of cases the retrospective effect of judge-made law is felt either to involve no hardship or only such hardship as is inevitable where no rule has been declared. I think it is significant that when the hardship is felt to be too great or to be unnecessary, retrospective operation is withheld. . . . When so much else that a court does, is

---

40. *See,* for example, *Chevron Oil Co. v. Huson, supra,* 404 U.S. at 107, 92 S.Ct. at 355, 30 L.Ed.2d at 306. In criminal cases, courts are also concerned about the impact of a finding of retroactivity on the judicial system. This is basically a concern that writs of habeas corpus based on the retroactive ruling would flood the judicial system. *See,* for example, *Linkletter v. Walker, supra,* 381 U.S. at 637–38, 85 S.Ct. at 1741–1742, 14 L.Ed.2d at 613.

done with retroactive force, why draw the line here? The answer is, I think, that the line is drawn here, because the injustice and oppression of a refusal to draw it would be so great as to be intolerable.[41]

The type of hardship which has been found to justify a purely prospective ruling is illustrated by *Chevron Oil Co. v. Huson,* cited *supra.* Huson suffered a back injury while working on an oil rig on the Outer Contineltal Shelf off Louisiana. He did not bring suit until three years later. The question presented was whether the Outer Continental Shelf Lands Act required the application of admiralty law or state law in determining if the suit was barred by lapse of time. Under admiralty law the suit was timely filed, but under Louisiana law it was barred by the one-year state statute of limitations. There had been a line of Fifth Circuit decisions interpreting the act so as to make general admiralty law time limits applicable. After Huson had filed his case, the United States Supreme Court ruled in another case, *Rodrigue v. Aetna Casualty and Insurance Co.,* 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969), that the Louisiana statute of limitations applied rather than admiralty time limits. The Court in *Huson* refused to apply the *Rodrigue* decision retroactively and as a result, Huson was not barred by the state statute of limitations. Had the court applied *Rodrigue* retroactively, Huson would have suffered the extreme hardship of losing his cause of action.

Any hardship to Mr. Warwick is minimal contrasted with that of Huson. Our decision was rendered on January 8, 1976, and the one-year period of prohibition against Mr. Warwick's appointment expired on January 20, 1976. It cannot be argued that the requirement that he be ousted from his office for that short period of time constituted any substantial hardship, nor are we persuaded that the necessity of having a new appointment confirmed by the same legislature which previously confirmed his appointment will constitute true hardship.

Counsel for Mr. Warwick also contends that a ruling against the validity of his appointment will give rise to the appearance that Commissioner Warwick obtained his office in some dishonorable fashion. We shall reiterate a portion of our prefatory opinion:

This opinion in no manner implies any impropriety on the part of Mr. Warwick or the appointing authority, Governor Jay S. Hammond. There is nothing in the record, and there was been no contention made that Mr. Warwick had any improper motive in voting for the general increase in salaries which included the emolument for the office of Commissioner of Administration for the State of Alaska; and, at the time that his appointment was made, there was a prior superior court opinion upholding an appointment of a legislator made under similar circumstances.

We do not believe that thinking Alaskans will impugn the honor of either Mr. Warwick or the Governor under the innocent circumstances here involved.

While we have held that there was a basis for reliance on the attorney generals' opinions and the superior court decision in *Strandberg,* reliance on such authority is not sufficient alone to tip the scales in favor of prospectivity. To apply a ruling prospectively in the face of the clear and unambiguous language contained in art. II, sec. 5 would require substantial hardship, and no such hardship has been presented in this case.

We conclude that the appointment of Mr. Warwick to the position of Commissioner of Administration was in violation of art. II, sec. 5 of the Alaska Constitution; that the subsequent pay raise enacted by the Ninth Alaska State Legislature did not render this case moot; and that our decision should not be applied purely prospectively.

AFFIRMED.

41. B. Cardozo, The Nature of the Judicial Process, 146–49 (1921).

## APPENDIX A

## PRE-CONSTITUTIONAL CONVENTION SALARY INCREASES

| | Attorney General | Auditor | Treasurer | Education Commissioner | Highway Engineer & Supvr. of Public Works | Commissioner of Mines | Commissioner of Health | Commissioner of Labor |
|---|---|---|---|---|---|---|---|---|
| 40 SLA 1943 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 3,600 |
| 64 SLA 1945 | 5,600 | 5,600 | 5,600 | 5,600 | 5,600 | 5,600 | ( * ) | 5,600 |
| 89 SLA 1947 | 6,600 | 6,600 | 6,600 | 6,600 | 6,600 | 6,600 | (General) | 6,600 |
| 114 SLA 1949 | 8,000 | 7,500 | 7,500 | 8,800 | 8,000 | 8,000 | (General) | 7,500 |
| 134 SLA 1951 | 10,000 | 8,000 | 8,000 | 12,000 | 8,000 | 8,000 | 12,000 | 8,000 |
| 141 SLA 1953 | 13,500 | 10,000 | 10,000 | 13,500 | 9,500 | 9,000 | 13,500 | 9,000 |
| 6 SLA 1955, 1st Extraordinary Session | 14,500 | 10,000 | 12,000 | 14,500 | 11,000 | 11,000 | 14,500 | 10,000 |

*26 SLA 1945 created the new position of Commissioner of Health at a salary not to exceed $10,000. The salary was to be determined by the Board of Health. For the next six years, no specific appropriation to the Commissioner of Health was listed.